**UNITED STATES of America,**

v.

**Kelvin JELKS, Defendant.**

**No. 00–CR–6152 CJS.**

United States District Court,
W.D. New York.

July 1, 2003.

---

Michael A. Battle, United States Attorney, By Everardo A. Rodriguez, Assistant United States Attorney, Rochester, NY, for the United States of America.

Mark D. Hosken, Federal Public Defender's Office, Rochester, NY, for Defendant.

## DECISION and ORDER

SIRAGUSA, District J.

## INTRODUCTION

This matter is before the Court on remand from the Second Circuit pursuant to its decision in *U.S. v. Jelks*, 53 Fed.Appx. 601 (2d Cir.2003) "for additional fact-finding and reconsideration of whether Le'Tasha Jelks' consent was voluntary." *U.S. v. Jelks*, 53 Fed.Appx. at 603. Upon such reconsideration, as explained below, this Court finds by a preponderance of evidence, based upon the totality of circumstances, that the consent given by Le'Tasha Jelks ("Ms. Jelks"), the defendant's daughter, was voluntary.

## BACKGROUND

The defendant was convicted after a jury trial of all three counts contained in the indictment · filed in this matter, and more specifically of Count 1, being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1); Count 2, possessing a firearm that had been illegally altered, in violation of 26 U.S.C. § 5871; and Count 3, possessing a firearm that was not registered to him in the National Firearm Registration and Transfer Record, in violation of 26 U.S.C. § 5861(d). This Court sentenced him to terms of 120 months imprisonment on Counts 1 and 3, to run concurrently, and a term of 30 months imprisonment on Count 2, to run consecutively to the other terms; and also ordered that his 150 month term of imprisonment run consecutively to his undischarged state term of imprisonment. On appeal, the defendant contested the Court's determination that his daughter, Ms. Jelks, who rented and lived in the premises in which he resided, voluntarily consented to a search of his room, where the weapon was found. That decision by this Court is the subject of the remand from the Circuit. In its decision, the Circuit Court offered specific direction:

The district court held that "the consent to search given by Ms. Jelks was voluntarily given and not the product of duress or coercion." However, the factual basis for the district court's finding is unclear from the record, as the court did not discuss the totality of the circumstances warranting such a finding. Moreover, at the time of the district court's ruling, it did not have the benefit of the New York State Division of Pa-

role, Policy and Procedures Manual, which governs parole officers' visits to the homes of parolees. The manual is now part of the record, pursuant to this Court's remand order of July 30, 2002. Accordingly, we remand this case to the district court for additional factfinding and reconsideration of whether Le'Tasha Jelks' consent was voluntary. *See, e.g., United States v. Mathurin*, 148 F.3d 68 (2d Cir.1998) (per curiam) (remanding case to district court for additional fact-finding without vacating defendant-appellant's conviction). The district court should consider the totality of the circumstances surrounding Ms. Jelks' consent, taking into account whether Mooney's representation of her authority to search Defendant–Appellant's residence was incorrect or misleading and, if so, whether Ms. Jelks' consent was nonetheless voluntary. We express no view on this issue. We note that while Mooney told Ms. Jelks that parole officers could search a parolee's residence "any time [they] felt that there was a need to do so," the parole manual requires that officers have "an articulable reason for conducting the search that is reasonably related to the circumstances of the particular case and rationally related to the officer's duty to supervise the releasee."

The district court should also consider the factors delineated in *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In particular, the district court should consider Le'Tasha Jelks' subjective understanding of the circumstances and of her ability to withhold consent, based upon considerations such as her age and education, as well as the fact that she had given birth four days prior to the search. Moreover, the district court should consider the objective circumstances surrounding the encounter, *viz.*, the fact that three parole officers con-

fronted Ms. Jelks in her home at night, and the parole officers' actions in obtaining Ms. Jelks' consent.

Finally, the district court should consider the significance *vel non* of the parole manual. We note that whether the search could be justified as a parole search, as well as the district court's finding that Mooney had no reasonable suspicion to believe that Defendant–Appellant was in violation of the terms of his parole, are not on appeal. However, we do not foreclose the district court from reconsidering any issues it deems relevant.

*U.S. v. Jelks*, 53 Fed.Appx. at 602–603.

On April 7, 2003, pursuant to the Circuit's mandate, the Court re-opened the hearing on the issue of Ms. Jelks' consent. The appellate decision allowed the Court to also reconsider its determination that the search of defendant's bedroom was not based upon reasonable suspicion to believe that he was in violation of the terms of his parole. However, the government declined to pursue this theory, as it had originally, and indicated that it was relying solely on Ms. Jelks' consent as the basis for the search and seizure. At the proceeding, Parole Officer Cynthia Mooney ("Mooney") was recalled to the stand. Additionally, the Court heard testimony from Parole Officer Sheila Tenae ("Tenae") and Ms. Jelks, neither of whom had testified at the original hearing. Moreover, a copy of the "New York State Division of Parole, Policy and Procedures Manual," to which the Circuit Court referred in its decision, was offered and received into evidence without objection (Defense Exhibit C), as was a copy of defendant's "Certificate of Release to Parole Supervision" (Defense Exhibit E).

Based upon the additional proof received at the re-opened hearing, including the Court's evaluation of the credibility of the

witnesses, Court makes the following supplemental findings of fact.[1]

## SUPPLEMENTAL FINDINGS OF FACT

In connection with her assignment as the defendant's parole officer, Mooney conducted a community prep visit prior to the defendant's actual release in August of 2000. A community prep visit is a visit to the residence where the parolee proposes to live while on release. In that regard, on July 11, 2000, Mooney went to 17 Second Street, Apartment 1A, in Rochester, New York, where she met with Ms. Jelks. Ms. Jelks herself was nineteen years old at the time of Mooney's visit. She had left school in 1998 after completing ninth grade, and could understand, read, and write English. The residence at 17 Second Street, Apartment 1A was leased to Ms. Jelks. She was responsible for paying the rent, and in that regard had applied for and was receiving rent assistance. Further, she paid the electric and phone bills. During her July 11th visit, Mooney discussed the conditions of the defendant's parole with Ms. Jelks, and informed Ms. Jelks that she would be making periodic visits to her residence. Mooney also explained the parole search policy to Ms. Jelks, indicating, "that if I felt there was a need do so, that I would be coming in to search his property and/or the residence, his room." Hearing Transcript at 21 (Apr. 7, 2003) Ms. Jelks, who was cooperative, friendly, and courteous, said "okay." Hearing Transcript at 21. (Apr. 7, 2003). Further, Ms. Jelks related to Mooney that she was remaining in the Rochester area solely to provide the defendant with a residence, and that, if he did not do well this time, it would be the "last straw" and she was planning to relocate down south with her mother. As to her

discussions with Ms. Jelks, Mooney recorded the following information in the Community Prep Form (Defense Exhibit A) she completed as to her July 11th visit:

Subject to reside with 19 yr old daughter, Letasha Jelks, who is pregnant, expecting her first child in October. The subject[']s 14 yr old daughter, Kenisha, is temporarily residing in the home until the completion of summer school 8/00. Letasha has indicated she is remaining in the Rochester area solely for the purposes of providing her father with a residence and if the subject fails to adjust satisfactory [sic] to parole, she will relocate down south with her mother. Ms. Jelks supports herself via her full time employment at McDonalds on W. Ridge Rd., Rochester NY. She receives food stamps & medicare [sic] via DDS. No animals or weapons indicated in the home. Ms. Jelks reported one prior arrest for disorderly conduct.

State of New York–Executive Department–Division of Parole Community Prep (Defense Exhibit A). On July 11, 2000, Mooney also left Ms. Jelks a copy of defendant's "Certificate of Release to Parole Supervision" (Defense Exhibit E). Ms. Jelks read the conditions of release listed on that document, and indicated that she understood all of the conditions of parole and that she had no problem with any of them. Included was the following:

4. I will permit my Parole Officer to visit me at my residence and/or place of employment and I will permit the search and inspection of my person, residence, and property . . . .

Certificate of Release to Parole Supervision (Defense Exhibit E).

Between July 11, 2000, and October 4, 2000, the date the handgun was discovered

---

1. Familiarity with the transcript of the Court's bench decision of May 1, 2001, will be presumed; however, for convenience sake, the transcript of the Court's original Findings of Fact, as set forth in that decision, is attached.

in the defendant's room, Mooney visited 17 Second Street, Apartment 1A twice. On at least one of those occasions, Ms. Jelks was present. She was friendly and did not object to Mooney visiting the residence. Further, prior to October 4, 2000, Mooney had received four reports from the Rochester Police Department[2] relating to the defendant (collectively received as Defense Exhibit B). One dated August 2, 2000, refers to 17½ Second Street[3] and states:

> Above location is reportedly active in drug sales. 2nd floor and attic apts were recently vacated and trespassers routinely use the apt to sell out of or bring girls into for prostitution activities. This occurs mostly in the evening and early morning hrs. Spec. attn for 3rd and 1st platoons.

The second, dated August 27, 2000, relates to 17 Second Street and, although none of the three suspects referenced is the defendant, nonetheless indicates:

> Neighbors called regarding an ongoing problem with (S[4]1, S2, S3) selling drugs in front of location. Neighbors say (S)'s sell right out in front of the house. Unknown if (S)'s use a stash inside or outside, one was not located. Record check neg. (S)'s released.

The third, dated September 1, 2000, again refers to 17½ Second Street and reports:

R/O[5] has received several 911 (refused) complaints of Drug Activity from the FIF location, regarding drug sales and use. The house is behind another house and they share the same driveway. 17½ is a beige color house with approximately 4 apts, two up and two down. The vice activity is supposedly coming for the apt on the ½ corner bottom apt. No info on tenants or those involved.

The fourth dated September 8, 2000, in which the defendant is identified as the "S1," states:

> R/O responded to above for 3 M/B[6]'s selling drugs out front. (S1) matched one of the descriptions. When R/O pulled up, a 2nd M/B ran inside to Apt. # 1. (S1) states that he is visiting his sister also in Apt. 1. No drugs found. (S) has prior arrests for drugs and is on parole til 4/4/2004 for CPCS 5th.

> R/O spoke with 911 center who stated that the activity does come from Apt. # 1 and he believes (S1) to be running location

Finally, prior to the search at 17 Second Street, Apartment 1A, Mooney conferenced the defendant's case with her senior parole officer, discussing with him the four police reports detailed above, after which he advised her to obtain consent and search the defendant's residence.[7]

---

2. These reports are referred to as FIF's. FIF stands for Field Interview Forms.

3. As established at the original hearing on this matter held on March 9, 2001, 17½ Second Street is a house which was set back behind the Jelks' residence at 17 Second Street, Apartment 1A.

4. S refers to "suspect."

5. R/O refers to "reporting officer."

6. M/B refers to "male, black."

7. At the re-opened hearing on April 7, 2003, Mooney testified as follows

Q. Why did you ask LeTasha Jelks that night for permission to search her father's bedroom?
A. As a result of the contact, in conference with my senior parole officer, he directed at some point to obtain a search of the parolee's residence.
Q. There was some contact in an FIF?
A. Yes.
Hearing Transcript at 36 (Apr. 7, 2003) This is in accord with Mooney's testimony at the initial hearing on March 9, 2001:
Q. Were you aware of the FIFs's before you went to the house that night?
A. Yes. In fact, just prior to that, if you look at my chronological entries, I had a conference with my senior parole officer which is what time we discussed

The New York State Division of Parole Policy and Procedures Manual addresses the circumstances under which a parole officer should seek consent to search. Specifically, Manual Item 9405.04 (Defense Exhibit C) states in relevant part:

**VISITATION**

**A. General Rule.**

A parole officer has a right to visit a releasee's residence. However, the releasee, or in the absence of the releasee, another member of the household may limit the parole officer's visit to one room of that residence.

Where the officer wishes to view other portions of the residence for casework, verification or other reasons, the officer may do so only with the consent of the releasee or another adult occupant of the household.

**B. Consent.**

Any adult who resides within the household may agree to permit the parole officer to examine the residence. Such consent may be limited, however, by the general authority of the person providing the consent. This means that the person permitting the officer to view the other areas of the residence must also have general access to those areas. Therefore, the areas that may be viewed with the consent of an adult household member include not only the generally accepted "common areas" such as a kitchen, living room, parlor, bathroom and the like, but also more private areas such as bedrooms so long as that person would generally have access to such rooms. The parole officer may rely on the apparent authority of the person granting the consent to view those areas to which access is granted. Furthermore, as any adult resident of the household may grant consent, if there is a

disagreement between two household members as to whether the officer may view other areas of the household, such disagreement does not prevent the officer from examining the areas to which the consenting adult has authorized access, as all members of the household have an equal ability to grant the consent.

**NOTE:**

For consent to be valid, it must be voluntarily given. Therefore, the use of coercion, duress or fraud may invalidate the voluntariness of a grant of consent. Further, consent may be withdrawn at any time and such withdrawal would preclude the officer from the continued examination of the residence. Questions concerning the apparent authority of a third party consentor, or whether the consent was voluntarily given, are determined by a review of the totality of the circumstances.

**II. SEARCH WARRANT WITHOUT A PAROLE VIOLATION WARRANT**

**A. General Rule.**

A parole officer may search a releasee for evidence of a crime or evidence of a violation of any of the releasee's conditions of parole where the officer has an articulable reason for conducting the search that is reasonably related to the circumstances of the particular case and rationally related to the officer's duty to supervise the releasee. Searches involving real or personal property that may require consent or a search warrant are specifically addressed in Section B entitled "Specific Applications". [sic] However, whether the search is of a person or property, no search should be considered unless the officer has an articulable reason for so doing that is rationally

---

the FIF's. He indicated that I should obtain consent and search his residence at some time in the future.

Hearing Transcript at 46–47 (Mar. 9, 2001).

related to the circumstances of the particular case and the officer's duty to supervise.

## B. Specific Applications.

### 4. Search of a residence.

The rules relating to visitation are also applicable to searches. Accordingly, a releasee's residence may be searched only where the officer has an articulable reason for conducting the search, and then only with the consent of the releasee, or the consent of another adult member of the household. Pursuant to the policies of the New York State Division of Parole, Mooney's articulable reason for requesting permission to search the defendant's bedroom was as follows:

The extensive nature of the subject's criminal history; the fact that he was arrested for a felony when he was serving time for possession of drugs, while on parole supervision; numerous field information forms I had received from the Rochester Police department indicating that the subject may in fact be involved in similar activity; and as I indicated, his history, which also included weapons possession.

Hearing Transcript at 45–46 (Apr. 7, 2003). This explanation is consistent with Mooney's testimony at the initial hearing on March 9, 2001.[8]

On October 4, 2000, at about 8:40 p.m., Mooney went to 17 Second Street, Apartment 1A along with Tenae and another parole officer, Thomas Hunt ("Hunt"). All were in plain clothes, and while all were armed, their weapons were concealed by their clothing. Ms. Jelks, who had turned twenty years old on September 11, 2000, came to the door after the officers knocked on it, and invited them inside the residence. At the time that Mooney, Tenae, and Hunt entered, present inside the residence, besides Ms. Jelks, were her sister, Kenisha, and her baby, born September 30, 2000. At the time the officers entered, the baby was sleeping in the living room.[9] After entering, Mooney asked Ms. Jelks how things were going and if there had been any problems. Ms. Jelks was very friendly and cooperative and said that there had not been any problems. Mooney next inquired if the defendant had been home at nighttime, to which Ms. Jelks responded that he usually came home at 10:30 p.m. Mooney then informed her that the defendant's curfew was at 10:00 p.m. Ms. Jelks indicated that she had not been aware of this.

Mooney then stated that she had not had a chance to look at the room where the defendant was staying and asked Ms. Jelks if she could do so. Ms. Jelks responded by saying "sure." Hearing Tran-

---

**8.** A. My articulable reason for searching Mr. Jelks' bedroom at that time was to ensure that he was in compliance of his parole supervision conditions, which would mean not to be in possession of any contraband or guns, weapons, anything illegal.

Hearing Transcript at 47 (Mar. 9, 2001)

 A. It was always something from all of the FIF's, from the information I was receiving that there was drug activity going on either at some apartment, if not his-I was concerned about-this was an ongoing concern of mine, and basically once I talked to my boss we decided we needed to consent to [sic] search at some point.

Hearing Transcript at 51 (Mar. 9, 2001)

**9.** At the re-opened hearing on April 7, 2003, Mooney testified that when Ms. Jelks invited her and the other officers to come inside 17 Second Street, Ms. Jelks' baby was sleeping in the living room. Hearing Transcript at 28 (Apr. 7, 2003). Ms. Jelks testified to the contrary. Hearing Transcript at 128 (Apr. 7, 2003). As the finder of fact, the Court must, of course, resolve conflicts in the testimony, and the Court did so whenever necessary. In this particular case, which the Court cites by way of example, the conflict was resolved in favor of Mooney.

script at 26 (Apr. 7, 2003). As to the request, neither Mooney nor the other officers used any force against Ms. Jelks. None of the them threatened to arrest her, threatened to take her baby away or, in fact, threatened her in any way. Ms. Jelks was not handcuffed or restrained in any fashion by any of the officers. Further, Ms. Jelks did not appear to be either distracted or in any pain. Additionally, she did not appear to be intoxicated on alcohol or drugs, nor did she appear to be sleepy or ask to lie down. In that regard, Ms. Jelks responded coherently to the questions Mooney asked, and she was never afraid she herself would be arrested. Moreover, a nurse was periodically visiting her residence to check on both her and her newborn baby. As to Ms. Jelks, the nurse was checking on stitches that she received, apparently resulting from childbirth; however, Ms. Jelks was not prescribed, nor was she taking, any medications in connection with the birth of her child. As to the baby, the nurse was providing instruction about things like breast feeding. Also, prior to October of 2000, Ms. Jelks had not only worked at McDonalds, but at Tremors Night Club and Tops Supermarkets as well.

Ms. Jelks, Mooney, Tenae, and Hunt proceeded to the defendant's bedroom. When they arrived there, Kenisha was inside the bedroom, standing in front of a mirror. Kenisha was relaxed and comfortable and continued fixing herself in the mirror as Ms. Jelks and the officers entered. Mooney questioned the presence of female items in the bedroom, including creams and lotions and a box of clothes. Ms. Jelks and Kenisha clarified that the these items belonged to Kenisha, but that everything else in the room belonged to the defendant. Mooney asked Ms. Jelks again if she had any problem with searching the bedroom. Ms. Jelks again responded that she did not. Mooney then asked Tenae to get a property receipt form from their vehicle, while she further explained the "process" to Ms. Jelks:

> I asked her to go to the car and get the form while I explained to LeTasha the process as detailed as I could. I took her back to the first time that I met her at the community prep stage and indicated to her about when I reviewed the condition about searching, if I felt the need to do so, and that this was what this occasion was; and I also explained that we weren't going to toss the whole apartment like the police do in the movies, that we're going to be very respectful with her property; and I was going to ask them to please come out while we do this, and I was going to explain to her the form.

Hearing Transcript at 32–33 (Apr. 7, 2003).

Mooney continued by explaining to Ms. Jelks that the form to which she referred was a property receipt form, which contained a place for Ms. Jelks to sign indicating that she had given verbal consent to search. Mooney asked Ms. Jelks if she understood everything fully, to which Ms. Jelks responded that everything was fine and that there was no problem. Mooney then asked Ms. Jelks and Kenisha to leave the room, after which time Hunt found, in the bedroom closet, the shotgun that formed the basis of the charges for which the defendant was convicted. Mooney informed Ms. Jelks that the shotgun was found and explained to her that she would be calling the police to take custody of the weapon. Also, after the shotgun was found, Ms. Jelks signed the Property Receipt Form (Government Exhibit 2) which, immediately preceding her signature, states in pertinent part:

> The below items were removed from the person, residence or other location as a result of a search conducted at 17 A[sic] Second St. in the presence of Kelvin Jelks ... or in the presence of the person who granted permission to search.

Property Receipt Form (Government Exhibit 2).

## ANALYSIS

 As indicated above, the Circuit determined that this Court could reconsider "the significance *vel non* of the parole manual" as to "whether the search could be justified as a parole search," along with the "finding that Mooney had no reasonable suspicion to believe that Defendant–Appellant was in violation of the terms of his parole." *U.S. v. Jelks,* 53 Fed.Appx. at 603. However, as previously stated, the government chose not to pursue this theory at the re-opened hearing, opting to rely solely on Ms. Jelks' consent to justify the search of the defendant's bedroom and seizure of the shotgun. In any event, the Court in its May 1, 2001, bench decision stated:

The Court rejects the government's contention that the September 8, 2000, FIF provided reasonable suspicion.

After the report was faxed to her on approximately September 9th, 2000 Officer Mooney discussed it with the defendant and was satisfied with his explanation, since he was, in all other respects in compliance with the terms and conditions of his parole. From her receipt of the FIF on September 9th until the date of the search, October 4th, the defendant reported to her weekly, and, in fact reported to her for an office visit earlier on the day that the search was conducted.

As Officer Mooney testified, she had no reason to believe he was in violation of parole, and the catch-all reason for justifying the search as being to ensure "he was in compliance with his parole supervision conditions" is not in the Court's

opinion sufficient justification for such search.

Transcript of Court's Bench Decision at 9–10 (May 1, 2001). In reaching this conclusion, the Court relied on the following guidance offered by the New York Court of Appeals in *People v. Huntley,* 43 N.Y.2d 175, 401 N.Y.S.2d 31, 371 N.E.2d 794 (1977) [10]:

Where, however, as here, the search and seizure is undertaken by the parolee's own parole officer, in our view whether the action was unreasonable and thus prohibited by constitutional proscription must turn on whether the conduct of the parole officer was rationally and reasonably related to the performance of the parole officer's duty. **It would not be enough necessarily that there was some rational connection; the particular conduct must also have been substantially related to the performance of duty in the particular circumstances.**

*People v. Huntley,* 43 N.Y.2d at 181, 401 N.Y.S.2d 31, 371 N.E.2d 794 (emphasis added).

Prior to October 4th, Mooney had already met with the defendant, discussed the FIFs with him, and determined that, rather than being in violation of the terms and conditions of his parole, he was in compliance with them. Objectively, the Court cannot see how then the subsequent search was "substantially related to the performance of duty in the particular circumstances." *Id.*

However, although the search of the defendant's room objectively fails to meet the *Huntley* requirements, that is not to say that the Court concludes that Mooney was somehow acting in bad faith.[11] Rather, the

---

**10.** This test established by the New York Court of Appeals has been approved by the Second Circuit. *U.S. v. Grimes,* 225 F.3d 254 (2d Cir.2000).

**11.** "The determination of suspicion involve a two-step process. First, a court must identify all of the relevant historical facts known to the officer at the time of the stop or search;

Court finds that subjectively Mooney believed that, having been specifically directed by her senior parole officer to obtain a consent to search the defendant's residence, she was in fact proceeding in accordance with the policies of the Division of Parole.

As an aside, the Court observes, although it is clear that "parole justifies some departure from traditional Fourth Amendment standards," *U.S. v. Grimes*, 225 F.3d 254, 258 (2d Cir.2000), the New York State Division of Parole Policy and Procedures Manual seems, at least in one respect, to afford parolees enhanced rather than diminished Fourth Amendment protection. Specifically, Manual Item 9405.04 requires, as a condition precedent to a search conducted pursuant to consent, "an articulable reason for conducting the search that is reasonably related to the circumstances of the particular case and rationally related to the officer's duty to supervise the releasee." Manual Item 9405.04, II A. This, in contrast with the well-settled rule that a search conducted pursuant to consent by an authorized third party, does not require any such predicate basis. *United States v. Matlock*, 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). *Koch v. Town of Brattleboro, Vermont* 287 F.3d 162, 167 (2d Cir.2002). By way of analogy, if the Division of Parole's rationale, as set forth in Manual Item 9405.04, was extended to police officers, it would logically mean that, absent probable cause, or at the very least reasonable suspicion, a search pursuant to consent could not be conducted. However, as *Matlock* and *Brattleboro* make clear, this is not the law.

 The Court now turns its attention specifically to the issue of Ms. Jelks' consent and whether such consent was in fact voluntary. The government, of course, bears the burden of establishing by a preponderance of evidence that consent was voluntarily given. *United States v. Buettner–Janusch*, 646 F.2d 759, 764 (2d Cir.1981). To be voluntary means that the consent was obtained without coercion. *Schneckloth v. Bustamonte*, 412 U.S. 218, 228, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In that regard, voluntariness is determined based upon the totality of circumstances, with a view as to whether consent was the product of free choice rather than merely the acquiescence to authority. *Schneckloth v. Bustamonte*, at 226, 93 S.Ct. 2041; *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir.1993); *United States v. $19,047.00 in U.S. Currency*, 95 F.3d 248, 252 (2d Cir.1996). Therefore, although it may be a factor in ascertaining whether the consent was coerced, knowledge of the right to refuse consent is not a requirement to a finding of voluntariness. *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir.1995).

 In analyzing the totality of circumstances, a number of factors are relevant. These generally include such considerations as age, education, background, and physical and mental condition, as well as the setting in which the consent is obtained. *Schneckloth v. Bustamonte*, 412 U.S. at 226, 93 S.Ct. 2041. In the case of Ms. Jelks, as made clear by the Circuit, the analysis must also include the fact that she had given birth four days prior to giving consent and the impact of Mooney's statement that, as to the defendant, parole could conduct a search "any time [they] felt that there was a need to do so." *U.S. v. Jelks*, 53 Fed.Appx. at 603.

The defendant, relying on *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), argues that

---

and second, it must decide whether, under a standard of objective reasonableness, those facts would give rise to a reasonable suspicion justifying a stop or probable cause to search." *Ornelas v. U.S.* 517 U.S. 690, 701, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

Ms. Jelks' consent was not voluntary but merely the acquiescence to authority. However, the Court disagrees. The circumstances regarding Ms. Jelks' consent are clearly distinguishable from those presented in *Bumper.* There, the Supreme Court observed:

> When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent.

*Bumper v. North Carolina,* 391 U.S. at 550, 88 S.Ct. 1788. However, here there was no such claim. Mooney knocked on the door to 17 Second Street, Apartment 1A, and she and the other officers were invited inside by Ms. Jelks, after which she sought consent to search.

Rather, applying the applicable principles of law to the findings of fact as detailed above, the Court determines that the government has established by a preponderance of evidence that Ms. Jelks' consent was voluntary. As directed by the Circuit, the Court, in examining the totality of the circumstances, considers Ms. Jelks' subjective understanding of the situation and of her ability to withhold consent. First, the Court concludes that there was nothing about Ms. Jelks' physical or mental condition that precluded her from comprehending her options or from giving voluntary consent. Although she had given birth on September 30, 2000, and received some stitches as a result, she was not taking any medications. Moreover, following the birth of her baby, a nurse visited Ms. Jelks both to check on the stitches, and to advise her on how to care for her newborn baby. This circumstance obviously contributed to Ms. Jelks' physical and mental well-being. Moreover, on October 4, 2000, at the time she gave consent, there was no indication that

Ms. Jelks was intoxicated, tired, confused, or that she was not feeling well. Rather, she was friendly and cooperative and responded coherently to the questions that she was asked. Additionally, Ms. Jelks' baby was asleep on the couch at the time Mooney, Tenae, and Hunt arrived, and consequently her attention was not distracted by the need to care for her child. Also, the fact that her fourteen-year-old sister Kenisha was relaxed and comfortable with Mooney, Tenae, and Hunt present in the residence, and even clarified for the officers those items in the defendant's room that belonged to her, is clearly indicative of a non-coercive setting. Also consistent with a non-coercive atmosphere is the fact that Ms. Jelks never entertained the possibility that she herself would be arrested. Additionally, the fact that Ms. Jelks could understand, read, and write English; the fact that she was the one who leased the apartment at 17 Second Street; the fact she was the one who paid the rent; the fact that she had applied for and was receiving food stamps, Medicaid, and rent assistance; the fact that she was the one who paid the electric and phone bills; and the fact that, prior to the birth of her child, she had been employed full time at McDonalds and also had worked at Tremors Night Club and Tops Supermarkets, are all circumstances consistent with her ability to voluntarily consent. On October 4, 2000, Ms. Jelks was, in fact, a twenty-year old self-sufficient young woman living independently and running her own household.

Next, in determining whether Ms. Jelks' consent was voluntary, the Court looks to the circumstances regarding the presence of Mooney, Tenae, and Hunt within the Jelks' residence. In that regard, the Court concludes that there was nothing in the officers' appearance or conduct which was coercive and, therefore, inconsistent with voluntary consent on Ms. Jelks' part.

All three were in plain clothes and, although each was armed, their weapons were all concealed from view. They knocked on Ms. Jelks' door and waited to go inside until invited. Mooney asked Ms. Jelks how things were going and if there had been any problems, and she also explained to Ms. Jelks the defendant's curfew was 10:00 p.m. and not 10:30 p.m. There is no evidence that the officers threatened Ms. Jelks or even that they raised their voices.

Nor, was there anything about the time of the officers arrived at Ms. Jelks' residence that impacted on her ability to voluntarily consent. Certainly nothing was adduced at the re-opened hearing on April 7, 2003 to suggest that Mooney's knock on the door at about 8:40 p.m. alarmed Ms. Jelks. Moreover, the testimony is consistent with the conclusion that Ms. Jelks was alert when she invited the officers inside her apartment. On this point, she never closed her eyes, fell asleep, or asked "to lie down because she was tired." Hearing Transcript at 79 (Apr. 7, 2003).

Finally, as directed by the Circuit, the Court considers whether Mooney's representation of her authority to search the defendant's residence was incorrect or misleading and, if so, whether Ms. Jelks' consent was nonetheless voluntary. As to Mooney's statement to Ms. Jelks that "parole officers could search a parolee's residence 'any time [they] felt that there was a need to do so,' "[12] the Court finds that it was inaccurate, since, as is clear from the New York State Parole Policy and Procedures Manual more is required to conduct a warrantless search. Specifically, a parole officer must both be able to articulate a reason for the search that is reasonably related to the circumstances of the particular case and rationally related to her or his duty to supervise the parolee, and then the officer must obtain consent. However, the

Court concludes, for two reasons, that Mooney's misstatement was not coercive, and consequently, does not impact the Court's determination that, based upon the totality of circumstances, Ms. Jelks' consent passes the voluntariness test.

First, the Court considers Mooney's contact with Ms. Jelks preceding the October 4, 2000, search. Prior to that date, Mooney had interacted with Ms. Jelks at 17 Second Street, Apartment 1A on at least two occasions. As to both, Ms. Jelks was cooperative, friendly, and courteous. At the community prep visit on July 11, 2000, Ms. Jelks confided in Mooney that she was remaining in the Rochester area solely to provide the defendant with a residence and that, if he did not do well this time, it would be the last straw and she was planning to relocate down south with her mother. Further, it was on that date that Mooney initially suggested, in a non-confrontational atmosphere, that she could search whenever she felt a need. Also, on that date, that Mooney gave to Ms. Jelks, a copy of the defendant's terms of parole, which included a condition that he consented to inspection and search of his residence. It is indicative of Ms. Jelks' attitude to fully cooperate with Mooney that she did not voice any concerns or have any problems with what Mooney told her or with the defendant's requirements of parole.

Second, the Court considers the chronology of events as they occurred on October 4, 2000. Of great significance is the fact that before Mooney reiterated that parole officers could search when they felt there was a need, Ms. Jelks had already consented twice to a search of the defendant's room. After Mooney explained to Ms. Jelks that the defendant's curfew was 10:00 p.m. and not 10:30 p.m., she indicated to Ms. Jelks that she had not had a

---

**12.** *U.S. v. Jelks,* 53 Fed.Appx. at 603

chance to look around the defendant's room and asked if she could do so. Ms. Jelks said sure. Then, after accompanying Ms. Jelks to the defendant's bedroom and clarifying with her and Kenisha what belonged to the defendant, Mooney again asked Ms. Jelks if she had any problem with Mooney searching the bedroom. Ms. Jelks again responded that she did not. It was only before asking Ms. Jelks to sign the Property Receipt Form (Government Exhibit 2) that Mooney " reviewed the condition about searching, if I felt the need to do so." Hearing Transcript at 32. (Apr. 7, 2003).

### CONCLUSION

Accordingly, the Court finds that, upon consideration of the totality of circumstances, the government has established by a preponderance of evidence that Ms. Jelks' consent was not the product of any type of physical or psychological coercion, but was, rather, in all respects voluntary.

It is so ordered.