18-403
*Kaminsky v. Schriro et al.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

**SUMMARY ORDER**

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 24th day of January, two thousand nineteen.

PRESENT:
          ROBERT A. KATZMANN,
            *Chief Judge*,
          PETER W. HALL,
          GERARD E. LYNCH,
            *Circuit Judges*.

---

JOSEPH W. KAMINSKY, JR.,

          *Plaintiff-Appellant*,

        v.                    No. 18-403

DORA B. SCHRIRO, Commissioner, Department of Emergency Services and Public Protection, *in her Individual and Official Capacities,* BARBARA MATTSON, *in her Individual Capacity,* VINCENT IMBIMBO, *in his Individual Capacity,* WALTER SOLENSKI, Lieutenant, Town of Coventry Police Department, *in his Individual and Official Capacities,* BRIAN FLANAGAN, Sergeant, Town of Coventry Police Department, *in his Individual and Official Capacities,* TED OPDENBROUW, *in his Individual Capacity,* ROBERT DEXTER, *in his Individual Capacity,* PAOLO D'ALESSANDRO,

Sergeant, Department of Emergency Services and Public Protection, *in his Individual and Official Capacities,* SEAN MUSIAL, *in his Individual Capacity,* MARK A. PALMER, Chief, Town of Coventry Police Department, *in his Individual and Official Capacities,* MICHAEL HICKS, *in his Individual Capacity*,

*Defendants-Appellees*.

For Plaintiff-Appellant: RACHEL M. BAIRD, Harwinton, CT

For Defendants-Appellees, Dora P. Schriro, Paolo D'Alessandro, Barbara Mattson, Vincent Imbimbo, and Sean Musial:

JAMES BELFORTI, Assistant Attorney General (Stephen R. Sarnoski, Assistant Attorney General, *on the brief*) *for* William Tong, Attorney General for the State of Connecticut, Hartford, CT.

For Defendants-Appellees, Mark A. Palmer, Walter Solenski, Brian Flanagan, Michael Hicks, Robert Dexter, and Ted Opdenbrouw:

DAVID C. YALE, Hassett & George, P.C. , Simsbury, CT.

Appeal from a judgment of the United States District Court for the District of Connecticut (Shea, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

Plaintiff-appellant Joseph M. Kaminsky, Jr. appeals from the judgment of the United States District Court for the District of Connecticut (Shea, *J.*) granting summary judgment in favor of defendants-appellees. We assume the parties' familiarity with the underlying facts, procedural history, and issues presented for review.

On December 16, 2011, an FBI agent telephoned Officer Barbara Mattson of the Connecticut State Police ("CSP") and advised her that Kaminsky had a felony conviction, thus rendering him ineligible to possess firearms legally. Following the call, and after her own

independent research appeared to confirm the agent's information, Mattson alerted the Coventry Police Department ("CPD"). After some discussion, three CPD officers—Sergeant Brian Flanagan, Officer Robert Dexter, and Officer Ted Opdenbrouw—accompanied Mattson, CSP officer Vincent Imbimbo, and CPD Lieutenant Walter Solenski to Kaminsky's home.

After arriving at Kaminsky's address, and noticing a path wrapping around the house, Mattson, Imbimbo, and Solenski approached Kaminsky's back door. Kaminsky recognized Solenski, with whom he was acquainted, and asked "What's up, Walt?" J. App. 231. Solenski asked, "Can we come in?" J. App. 136, 460, and, by his own account, Kaminsky "waved them in." J. App. 136. Once the officers were inside, Mattson explained the purpose of their visit. After speaking with Kaminsky's attorney over the phone at Kaminsky's invitation, Mattson gave Kaminsky two letters: one revoking his permit to carry firearms and the other informing him that, as a convicted felon, he could no longer legally possess firearms.

Kaminsky then surrendered his permit and voluntarily surrendered multiple firearms from different storage areas around the house. Kaminsky was asked to come to the CPD to sign and receive a copy of paperwork indicating that he had surrendered his firearms. He did so, and signed the relevant paperwork.

While the others were inside, Flanagan, Dexter, and Opdenbrouw remained outside. They waited near a low stone wall in Kaminsky's backyard area, which faces a public lake.[1] None of these officers—Flanagan, Dexter, or Opdenbrouw—entered Kaminsky's home. They conducted no searches or investigations while in the yard.

---

[1] There was some dispute below as to whether the three officers were located on Kaminsky's property or on a neighbor's. We view the facts in the light most favorable to Kaminsky, and draw all reasonable inferences in his favor. *See Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998).

On December 19, 2011, following a phone call from Kaminsky's attorney, Mattson returned to Kaminsky's home with another CSP officer, Sean Musial. Kaminsky handed over an additional 23 firearms to Mattson and Musial. Kaminsky went to the CPD to sign for the surrender of those firearms on December 20. Of the 59 firearms logged as surrendered on December 16 and 19, the CPD identified three weapons as illegal assault weapons under Connecticut state law. After Kaminsky received a full pardon for his criminal convictions on March 4, 2013, all but those three firearms were returned to him. [2]

The district court dismissed all claims against the state defendants in their official capacities and several claims against all defendants, leaving only Kaminsky's allegation that his Fourth Amendment rights were violated when officers entered his home, waited on his property, and seized his firearms. The district court granted two motions for summary judgment filed by the defendants which, together, addressed all remaining claims and defendants. Kaminsky appeals the grant of both summary judgment motions.

"We review *de novo* a district court's grant of summary judgment after construing all evidence, and drawing all reasonable inferences, in favor of the non-moving party." *Sotomayor v. City of New York*, 713 F.3d 163, 164 (2d Cir. 2013) (per curiam).[3] "Summary judgment is appropriate only when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

"[A] warrant is generally required for a search of a home, but the ultimate touchstone of the Fourth Amendment is reasonableness." *Fernandez v. California*, 571 U.S. 292, 298 (2014).

---

[2] The status of these weapons under Connecticut law remains at issue in litigation instituted by Kaminsky in the Connecticut state courts.

[3] Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, footnotes, and citations.

4

"A warrantless consent search is reasonable and thus consistent with the Fourth Amendment irrespective of the availability of a warrant." *Id.* at 306. "[T]he lawful occupant of a house or apartment should have the right to invite the police to enter the dwelling and conduct a search." *Id.* at 307. "It would be unreasonable—indeed, absurd—to require police officers to obtain a warrant when the sole owner or occupant of a house or apartment voluntarily consents to a search." *Id.* at 298. However, "[t]he consent must be a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." *United States v. Iverson*, 897 F.3d 450, 458 (2d Cir. 2018). "Determination of whether such an individual has so consented requires a fact-based inquiry that considers the totality of all the circumstances." *Id.*

Here, Kaminsky consented to the officers entering his home after Solenski asked if they could enter. Kaminsky concedes that he invited Solenski into his home, but argues that his consent did not extend to Mattson and Imbimbo. The evidence is to the contrary. Solenski asked, "Can *we* come in?" J. App. 460 (emphasis added). Furthermore, Kaminsky's own deposition testimony states unambiguously: "I left the door open and waved *them* in." J. App. 136 (emphasis added). Furthermore, Kaminsky expressed no surprise that the other two officers entered his home, did not request that they leave, and did not seek clarification from Solenski.

Moreover, "[c]onsent may be express or implied." *Iverson*, 897 F.3d at 458; *see also Birchfield v. North Dakota*, 136 S. Ct. 2160, 2185 ("It is well established that a search is reasonable when the subject consents and that sometimes consent to a search need not be express but may be fairly inferred from context."). Even if he did not expressly invite Mattson and Imbimbo into his home, Kaminsky impliedly consented to their entry.[4]

---

[4] Kaminsky also argues that the officers inappropriately sought consent to enter his home instead of obtaining a warrant, which he argues they could easily have done. As the Supreme

5

Nor were Kaminsky's firearms seized in violation of his Fourth Amendment rights. Indeed, Kaminsky does not dispute that, on the advice of his attorney, he consented to the surrender of his firearms. Rather, he argues that the seizure—and the initial entry—were based on a faulty premise: It is now agreed by all parties that he was not actually a convicted felon, because the offense for which he was convicted in 1964 was not a felony at the time of his conviction. But this error on the part of Mattson, which Kaminsky does not contend was anything more than (at most) negligent,[5] is not sufficient reason to find that Kaminsky's consent to turn over his weapons (or for the officers to enter his home) was coerced. *See United States v. Jelks*, 273 F. Supp. 2d 280, 291 (W.D.N.Y. July 3, 2003) (finding voluntary consent where a police officer incorrectly told the plaintiff that "parole officers could search a parolee's residence any time [they] felt that there was a need to do so") *aff'd*, 73 F. App'x 486 (2d Cir. 2003); *cf. Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (stating, in the context of confessions, the "fact that the police misrepresented . . . statements . . . is, while relevant, insufficient . . . to make [an] otherwise voluntary confession inadmissible"). Under the totality of the circumstances, *see Schneckloth v. Bustamonte*, 412 U.S. 218, 227-28 (1973), no reasonable factfinder could conclude that Kaminsky's consent to the entry into his house and the seizure of his firearms was

---

Court has noted, however, a warrantless consent search is reasonable "*irrespective* of the availability of a warrant." *Fernandez*, 571 U.S. at 306 (emphasis added).

[5] Indeed, Mattson's mistake appears to have been reasonable. Mattson was informed by an FBI agent that Kaminsky was a convicted felon. She cross-referenced this information with a statewide database which showed a felony conviction. She compared the fingerprints associated with his 1964 conviction to his permit application to confirm that the convicted felon and permit applicant were one and the same. *Cf. United States v. Santa,* 180 F.3d 20, 27 (2d Cir. 1999) (finding that a police officer's reliance on a statewide computer database erroneously showing existence of an outstanding arrest warrant was objectively reasonable). It apparently took some time after the seizure for lawyers to research the question and determine that the offense of conviction was a misdemeanor in 1964.

coerced. The officers at no time drew weapons, made threats, raised their voices, or demanded compliance. Kaminsky was in contact with an attorney, who spoke with the officers and advised that Kaminsky would cooperate with their inquiry. The officers made no independent search of any part of Kaminsky's house, but seized only firearms whose locations he pointed out to them.

With respect to the claim that the officers who remained in the yard violated the Fourth Amendment by entering the curtilage of Kaminsky's home, even assuming—without deciding—that the officers were present on the curtilage, and that their mere presence, without engaging in any search or seizure in the area, violated the Fourth Amendment, the officers are entitled to qualified immunity. "The doctrine of qualified immunity gives officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017). It is designed to protect "all but the plainly incompetent or those who knowingly violate the law." *Id.* at 1867. A plaintiff may overcome a qualified immunity defense only by showing "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Kaminsky has made no argument in response to the officers' claim of qualified immunity. Accordingly, he has waived any objection to that claim. *See City of Syracuse v. Onondaga Cty.*, 464 F.3d 297, 308 (2d Cir. 2006).

In any event, the district court's conclusion that the officers are entitled to qualified immunity was correct. Even if the area was curtilage, the officers' belief that the area in which they waited was not curtilage was reasonable. At the time of the incident in question, the principal authority for classifying an area proximate to a house as curtilage or not was *United States v. Dunn*, 480 U.S. 294 (1987), which sets out a highly fact-specific four-factor test. *Id.* at 301. However, "combining th[ose] factors [does not] produce[ ] a finely tuned formula that,

7

when mechanically applied, yields a 'correct' answer to all extent-of-curtilage questions." *Id*. In a careful and thorough opinion, the experienced district court analyzed the *Dunn* factors and concluded that the area where the officers stood was not curtilage. Kaminsky cites no authority, extant at the time of the incident, sufficiently analogous to the specific facts of this case to have required a reasonable officer to reach a contrary conclusion. To the extent that cases post-dating the incident, such as *Florida v. Jardines*, 569 U.S. 1 (2013), *United States v. Alexander,* 888 F.3d 628 (2d Cir. 2018), and *Collins v. Virginia*, 138 S. Ct. 1663 (2018)*,* can be argued to call the district court's analysis into question in any way, the officers cannot be expected to have anticipated such developments. The district court's decision at a minimum establishes that a reasonable officer in 2011 could reasonably have concluded that the area in question was not curtilage.

We have considered all of Kaminsky's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

8