In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3517

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARCO PINEDA,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 CR 382 — **Elaine E. Bucklo**, *Judge.*

ARGUED SEPTEMBER 30, 2013 — DECIDED FEBRUARY 14, 2014

Before WOOD, *Chief Judge*, and BAUER and KANNE, *Circuit Judges.*

BAUER, *Circuit Judge.* Defendant-appellant, Marco Pineda ("Pineda"), was convicted of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He was sentenced to 115 months of imprisonment, followed by three years of supervised release, and ordered to pay a fine of $100. Pineda appealed the district court's judgment, arguing: (1) the court violated his right to a fair jury trial under the Sixth and

Fourteenth Amendments when it struck the sole Hispanic member of the jury for cause and replaced him with an alternate during trial, and (2) the court committed procedural error by failing to adequately consider all of the factors under 18 U.S.C. § 3553(a)(1) at sentencing. We find no abuse of discretion or procedural error and affirm the district court's judgment.

## I. BACKGROUND

The government prosecuted Pineda, who is Hispanic, in the United States District Court for the Northern District of Illinois in a single-count indictment for possessing a firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1). Jury selection for Pineda's trial began on December 12, 2011.

During *voir dire*, the sole Hispanic juror in the venire, Felipe Vega ("Vega"), revealed that his ability to speak and understand the English language was limited. One of the first statements Vega made to the court was, "I'm sorry. I don't speak English." Nonetheless, Vega generally was able to comprehend and answer the standard biographical questions posed to him in English by the district court judge. For example, Vega was able to explain that while he was born in Mexico, he is an American citizen and took his citizenship examination in English. Vega mentioned that he has lived in the United States for twenty years, works on a golf course, and occasionally watches local televised news in English. In spite of this, Vega acknowledged that he did not understand the introductory statements made by the court concerning the federal jury trial system. In addition, the court had trouble hearing and understanding Vega's responses and frequently asked him to repeat

his answers. After the inquiry into his English language capabilities, the court determined that Vega required the assistance of an interpreter in order to meet the necessary requirements of jury service.

After questioning the rest of the jury venire, the government moved to strike Vega as a potential juror for cause. The defense objected, arguing that Vega should be left in the venire because "[Vega] answered the majority of [the court's] questions" and should be assigned an interpreter. The judge stated that she had never dealt with the use of an interpreter for a jury member before and would "have to look into it," but she was "not going to strike [Vega] right now without knowing." After concluding that she would not strike Vega from the venire at that point, the judge called Vega to a sidebar at which time he indicated that he "sometimes" understood the court's questions, but that he would like the assistance of an interpreter.

After the sidebar proceedings, the jury venire was excused from the courtroom. The government repeated its concern that Vega did not fully comprehend the court's statements or questions and so should be stricken for cause. The judge agreed that she had "some serious questions about what all [Vega] understood" and called Vega back into the courtroom. A Spanish interpreter was also brought to the courtroom to review the court's *voir dire* questions and introductory statements with a translation. Through the interpreter, Vega was able to respond to the court's questions without difficulty. The court then excused the interpreter and allowed Vega to rejoin the venire.

At this point, both parties provided the court with their peremptory strikes. Neither the government nor the defense used a peremptory challenge to remove Vega. The court therefore seated Vega on the jury and arranged for the interpreter to assist him during trial. The district court swore in Vega and the other jurors, including two alternate jurors.

During a brief recess before the start of trial, the court reviewed the juror qualification statute and contacted the Chief Judge of the district court to verify her decision to provide Vega with an interpreter. The court reconvened with the parties and indicated that while Vega might have to be excused for cause, she was unsure as to whether he should be considered disqualified. The government requested additional time to research the issue, but the court refused stating, "I can't imagine what the harm to the process is to have an interpreter here this afternoon." The court noted that the trial would be short and if Vega ended up being excused for cause due to his English language deficiencies, one of the two alternates would simply take his place and the trial would continue.

The jury was called back into the courtroom and the trial commenced. On the afternoon of December 12, 2011, the jury heard opening statements from the government and the defense as well as direct testimony from the government's first witness, Officer Colindres. After the defendant's cross-examination of Officer Colindres, the court excused the jury until the next day.

After the jury left the courtroom, the court informed the parties that she was still concerned with how to address the issue of using an interpreter to assist Vega. The court reviewed

Vega's juror qualification form and observed that it appeared to have two different types of handwriting. Additionally, Vega had answered "no" to the question of whether he was able to "read, write, speak, and understand the English language." The court told the parties that she would question Vega about the questionnaire the following morning, but it seemed to her that Vega was not in fact qualified to be a juror under 28 U.S.C. § 1865(b)(2). The trial adjourned until the next day.

Before testimony resumed on December 13, 2011, the court informed the parties that there was insufficient funding to pay for an interpreter to stay for the remainder of the trial, and that after further research, she discovered that the law does not require a court to accommodate a juror who does not speak or understand English. The government renewed its motion to strike Vega for cause; the defendant objected, arguing that Vega appeared to understand English well enough to deliberate with the other jurors without the assistance of an interpreter. The court was "not satisfied" with the record from the previous day and asked for Vega to be called in for additional questioning.

With the assistance of the interpreter, the court informed Vega that the court could not afford to pay for the interpreter for the rest of the trial. Vega then explained that he filled out his juror qualification form with the help of a notary who translated it for him. Whenever the court attempted to question Vega without the interpreter's assistance, Vega had difficulty responding and requested a translation. Through the interpreter, Vega explained that he was not able to fully understand the other jurors while in the jury room when they

conversed in English. At this point, the court replaced Vega with the first alternate juror.

The trial continued on December 13, 2011, with the first alternate juror who had been present for all trial proceedings the previous day. After Officer Colindres completed his testimony, the government noted at a sidebar that one of the jurors appeared to be looking for Vega. Before the next witness was called, the court explained to the jury that Vega was excused due to a lack of funding to pay for an interpreter. At the close of the government's case, the defense moved for a mistrial on the basis of Vega's removal from the jury; the district court denied the motion. On December 14, the jury returned a verdict of guilty.

The defendant moved for a judgment of acquittal or a new trial, based on the removal of Vega. The court denied the motions.

The Presentence Investigation Report ("PSI") calculated Pineda's offense level to be 24. According to the PSI, Pineda accumulated 18 criminal history points; the resulting advisory Guidelines range was 100 to 120 months' imprisonment. Neither Pineda nor the government challenged the calculations in the PSI. Pineda requested a sentence of 30 months, far below the Guidelines range.

On October 26, 2012, after arguments from both the government and Pineda, the district court sentenced Pineda to 115 months' imprisonment, followed by three years of supervised release, and imposed a fine of $100. Pineda was also required to forfeit the handgun and ammunition recovered by

the police at the time of his arrest. Pineda filed a timely notice of appeal on November 2, 2012.

## II. DISCUSSION

### A. Removal and Replacement of Juror Vega

The requirements for jury service include, in relevant part, that a prospective juror be able to read, write, speak, and understand the English language and fill out the juror qualification form. 28 U.S.C. § 1865(b)(2), (b)(3). English language proficiency is essential for a juror to comprehend the issues presented at trial, assess the evidence, and come to an independent judgment. If a potential juror cannot meet this requirement, he should be disqualified from serving as a juror. A juror that is unable to read, write, speak, and understand English may be appropriately stricken for cause. *See, e.g.*, *United States v. De La Paz-Rentas*, 613 F.3d 18, 24 (1st Cir. 2010) (upholding the constitutionality of the requirement that individuals understand and be literate in English to serve on a federal jury).

Federal Rule of Criminal Procedure 24 provides for the removal and replacement of jurors "who become or are found to be unable or disqualified to perform their duties" after the trial has begun as long as the court has a reason to excuse the juror for cause and there was "some changed circumstance." Fed. R. Crim. P. 24(c)(1). "It is within the trial judge's sound discretion to remove a juror whenever the judge becomes convinced that the juror's abilities to perform his duties become impaired." *United States v. Speer*, 30 F.3d 605, 610 (7th Cir. 1994) (quoting *United States v. Huntress*, 956 F.2d 1309, 1312 (5th Cir. 1992)). This Court will not overturn the trial court's

decision to dismiss a juror pursuant to Rule 24(c) unless *no legitimate basis* for the court's decision can be found in the record, and the appellant shows that the juror's dismissal prejudiced his case. *United States v. Vega*, 72 F.3d 507, 512 (7th Cir. 1995).

In this case, the district court judge determined that Vega did not possess the requisite English language proficiency to serve as a juror without an interpreter. Because this is a legitimate basis for removing a juror, the district court did not abuse its discretion by removing and replacing Vega.

Pineda argues that there was no legitimate basis for removing Vega because Vega's proficiency in English did not change from the first day of trial to the last. While Vega's language abilities did not change overnight, it became apparent that his ability to communicate with the other jurors and to understand the trial proceedings were inadequate. The court learned that Vega did not fill out his juror qualification form on his own, but required the assistance of a notary to translate the form for him. Vega also made a direct statement to the court that he was unable to communicate freely with the other jurors without the assistance of an interpreter. The removal was amply justified.

Pineda cites *United States v. Dempsey*, 830 F.2d 1084 (10th Cir. 1987) to argue that Vega was qualified to remain on the jury; however, this case is distinguishable. In *Dempsey*, an interpreter was provided for a deaf juror throughout the duration of the trial. *Id.* The district court held that utilizing the interpreter for the deaf juror was "an acceptable means to accommodate [the juror's] hearing loss." *Id.* at 1088. Even

without the assistance of an interpreter, the juror was able to competently fill out her juror qualification form, read lips, and speak for herself when communicating with the court during *voir dire* and with the other jurors during jury deliberations. *Id.* at 1086–87. Moreover, the court noted that the deaf juror was well-educated, worked in an environment that required her to understand and communicate in English, and could lip read to verify the accuracy of the interpreter's translations. *Id.* Essentially, the juror could still understand trial proceedings and communicate with other jurors even if the interpreter was unavailable; the assistance of an interpreter merely enhanced the juror's communication abilities.

By contrast, Vega was unable to effectively communicate or understand trial proceedings without the assistance of an interpreter. He required an interpreter for even a basic comprehension of the trial proceedings and had great difficulty understanding and communicating with the other jurors.

Pineda then cites *United States v. Campbell*, 544 F.3d 577 (5th Cir. 2008) to argue that a mistrial should have been declared after Vega's removal from the jury. In *Campbell*, the district court declared a mistrial after it discovered that a juror's limited ability to speak English precluded him from meaningfully participating in jury deliberations. *Id.* at 580. At the close of testimony, the judge sent the jury to deliberate. *Id.* The jury sent a note to the trial judge stating that one juror, Francisco Ramirez, was unable to understand what was happening and needed interpretation of the deliberations. *Id.* at 579. Ramirez confirmed this, stating in open court that he was unable to participate in deliberations because his limited English language abilities hindered communication with the other

jurors. *Id.* at 580. The court noted that it could appoint an interpreter for deliberations, but that it would not assuage the concerns over whether Ramirez had sufficiently understood the trial testimony and proceedings. *Id.* at 582. The court then suggested that Ramirez be dismissed. *Id.* Since the alternate jurors had already been excused, however, the jury would have to continue deliberations with only eleven jurors. *Id.* The defense refused this alternative. *Id.* The district court found that Ramirez could not "effectively communicate and partici-pate in the jury deliberative process" and declared a mistrial. *Id.*

A mistrial in *Campbell* was appropriate because the jury had begun deliberations when Ramirez's inability to communicate came to the court's attention. At this point, the alternate jurors had been dismissed and did not have the ability to replace Ramirez. "When facts arise before the start of deliberations that cast doubt on a juror's ability to perform [his] duties, the district court bears discretion to excuse the juror and replace [him] with an alternate." *United States v. Smith*, 918 F.2d 1501, 1512 (11th Cir. 1990) (citations omitted). In this case, when the court discovered that Vega was unable to perform his duties, she replaced him with an alternate who had been present for the entirety of the trial.

Whatever the basis for removing Vega, overturning the district court's decision pursuant to Rule 24(c) requires Pineda to show that the removal of the juror had a prejudicial effect on his trial. *Vega*, 72 F.3d at 512. Pineda argues that the other jurors appeared to be "alarmed" by the removal of Vega, the sole Hispanic juror, and that the court's explanation was insufficient in assuaging their concerns. The court and both

parties were aware at trial that upon Vega's removal, the other jurors wanted to know why he was excused. The court promptly addressed this issue by making the following statement to the jury: "I excused a juror who had to have an interpreter because it turns out that there really aren't enough funds to pay interpreters, so I had no choice. Thank you."

Although this is the explanation the court provided to the jury, the lack of funding was not the court's primary or sole reason for removing Vega from the jury. Nonetheless, the court's comments to the jury after Vega was removed made it clear that Vega was removed because of his inability to communicate sufficiently with the other jurors in English, not because of his ethnic background.

In conclusion, even if the court made a mistake by allowing Vega on the jury for the first day of trial, any mistake was harmless and effectively remedied. As soon as the court was informed that Vega could not adequately fulfill his duties as a juror, the court cured the error quickly and effectively by replacing him with an alternate juror who had been present for the duration of the trial. In sum, the district court's decision to dismiss and replace Vega was a sound method of remedying the situation, and the decision was not an abuse of discretion.

## B. Consideration of Sentencing Factors

Pineda also argues that the court committed procedural error by failing to consider all of the factors under 18 U.S.C. § 3553(a)(1) at sentencing. This Court reviews a district court's sentencing decisions by first ensuring that no significant procedural error has been committed. *Gall v. United States*, 552 U.S. 38, 51 (2007). If we determine that the sentence was

procedurally sound, we then consider the substantive reason-
ableness of the district court's sentence under an abuse of
discretion standard. *Id.* A sentence within the advisory
Guidelines range is presumed reasonable and the burden falls
on the defendant to prove otherwise. *Id.* The findings of the
trial judge in sentencing will only be reversed if the decision
lacks any foundation or the court is "left with the definite and
firm conviction that a mistake has been committed." *United
States v. Souffront*, 338 F.3d 809, 832 (7th Cir. 2003); *United States
v. McIntosh*, 198 F.3d 995, 999 (7th Cir. 2000).

The district court must provide reasons for its sentencing
decisions and address all of the defendant's principal argu-
ments that are "not so weak as to not merit discussion." *United
States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005). How-
ever, the courts are not required to "tick off every possible
sentencing factor in detail and discuss separately every nuance
of every argument." *United States v. Collins*, 640 F.3d 265, 271
(7th Cir. 2011).

In his submissions to the court for sentencing, Pineda
requested a sentence below the Guidelines range based on his
personal and family history. Pineda recounted that he is the
son of an alcoholic father who frequently beat his wife and
children. According to Pineda, both his older brothers also had
problems with alcohol, creating a home environment that led
him to begin drinking regularly as a teenager. Pineda ex-
plained that his prior criminal offenses, including gang
loitering, residential burglary, attempted robbery, battery,
disorderly or reckless conduct, and soliciting unlawful drug-
related business, were mostly non-violent and were primarily
committed in his mid-teens to early twenties. Moreover,

Pineda detailed his more recent history, including supporting his fourteen-year-old son, caring for his uncle's ill father, and his pursuit of further education while in pre-trial detention. Pineda argues that the district court sentencing decision failed to consider these potentially mitigating circumstances and that a lower sentence was warranted in light of these factors.

The record here shows that the court adequately addressed Pineda's arguments, noting that the court found "nothing whatsoever here that's mitigating." When discussing Pineda's history and characteristics, the court stated:

> So when we get to [the] history and characteristics of the defendant, and really other than, as you said, that, you know, it's true, people do get to federal court and all of a sudden that revolving door that they have been able to take advantage of in state court from which sometimes some people learn and sometimes they don't, and clearly Mr. Pineda had not learned from it, and all of a sudden you're here in federal court. And yes, indeed it is serious.

Noting the unfortunate pattern of repeat offenders such as Pineda receiving relatively light sentences in state court until they are subjected to the federal system, the court determined that Pineda's personal and family characteristics were not mitigating. In light of the severity of his offense and the fact that Pineda had continuously returned to the criminal justice system, the court did not err when it decided that a sentence within the Guidelines range was warranted.

Pineda further argues that the district court made a clear factual error at sentencing when she stated that at the time of

Pineda's arrest, he had the intention of using the firearm he possessed and carried to the scene of a homicide. Specifically, the district court commented:

> The statement that night, the statement of what had happened was corroborated certainly by what had happened to this other person, and I'm left with the idea of a 37 or 38-year-old, maybe not a 37-year-old man well into adulthood saying "I'm going out with a loaded gun." I mean, if you'd never had any history and didn't have the law saying you couldn't have one at all, for what reason? I mean, I have to assume with the intention, depending upon the circumstances, of using it.

The court's comments address evidence presented at trial about Pineda's possession of a loaded gun, in particular Pineda's statement to the police at the time of his arrest. Pineda said, "Officer, I just found out that Franco got killed. I went and picked up the gun, and I was going over there to find out what had happened." The gun Pineda possessed at the time of his arrest was loaded with seven live rounds in the magazine and one live round in the chamber. His criminal history revealed that Pineda had three prior convictions on gun charges, including one conviction for aggravated battery where Pineda shot another individual with a gun. In sum, this evidence led the district court judge to reasonably infer that Pineda was willing to use the gun "depending upon the circumstances." The court did not clearly err in determining that the defendant was capable of using the gun he possessed and would have used it if the circumstances warranted it. In summary, we find no error in the district court's sentencing

decisions. The within-Guidelines range the court imposed was reasonable and not an abuse of discretion.

### III. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.