16-3829-cr
USA v. Iverson

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2017

(Argued:  February 22, 2018                    Decided:  July 31, 2018)

Docket No. 16-3829-cr

_____

UNITED STATES OF AMERICA,

*Appellee,*

- v. -

ELIJAH IVERSON,

*Defendant-Appellant*.

_____

Before:  KEARSE, CALABRESI, and LIVINGSTON, *Circuit Judges*.

Appeal from a judgment of the United States District Court for the Western District of New York, Lawrence J. Vilardo, *Judge*, convicting defendant on five counts of drug- and gun-related offenses, *see* 21 U.S.C. §§ 841(a)(1), 856(a)(1), and

18 U.S.C. §§ 922(g)(1), 924(c)(1)(A)(i). Defendant contends principally that the district court erred in denying his pretrial motion to suppress physical evidence seized from his home after police officers, responding to defendant's 911 call complaining of an armed prowler, entered his home with a K-9 police dog that soon alerted to the presence of narcotics. The district court found no Fourth Amendment violation given that, after responding officers asked to speak with defendant, defendant gave the officers and the dog at least implicit permission to enter his apartment. Defendant also contends that his Fifth and Sixth Amendment rights were violated when the district court, during the trial, dismissed one of only two black jurors, who had been empaneled after a successful objection pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986). We find no merit in defendant's challenge to the denial of his suppression motion; as to the dismissal of the juror, we conclude that Iverson's constitutional contentions lack merit, and we conclude that any procedural error was harmless.

Affirmed.

ELIZABETH R. MOELLERING, Assistant United States Attorney, Buffalo, New York (James P. Kennedy, Jr., Acting United States Attorney for the Western District of New York, Buffalo, New York, on the brief), *for Appellee*.

2

PETER J. TOMAO, Garden City, New York (Richard M. Langone, on the brief), *for Defendant-Appellant*.

KEARSE, *Circuit Judge*:

Defendant Elijah Iverson appeals from a judgment entered in the Western District of New York following a jury trial before Lawrence J. Vilardo, *Judge*, convicting him of possessing cocaine and cocaine base (or "crack") with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), possessing marijuana with intent to distribute, in violation of *id*. §§ 841(a)(1) and 841(b)(1)(D), maintaining drug-involved premises, in violation of *id*. §§ 856(a)(1) and (b), possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i), and possession of a firearm and ammunition as a convicted felon, in violation of *id*. §§ 922(g)(1) and 924(a)(2), and sentencing him principally to 15 years' imprisonment, to be followed by eight years of supervised release. On appeal, Iverson contends principally that the district court erred in denying his pretrial motion to suppress evidence seized from his home after police officers, responding to his 911 call complaining of an armed prowler, entered his home with a K-9 police dog that thereafter alerted to the presence of narcotics. The district court denied the motion

3

to suppress, finding no Fourth Amendment violation because Iverson, after officers responding to his 911 call asked to speak with him, gave the officers and the dog at least implicit permission to enter his apartment. Iverson also contends that his Fifth and Sixth Amendment rights to equal protection and trial by a jury drawn from a cross-section of the community were violated when the district court, during the trial, dismissed one of only two black jurors, who had been empaneled after his successful objection pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), to the government's use of peremptory challenges during voir dire. Finding no merit in any of Iverson's constitutional contentions, and concluding that any procedural error in the dismissal of the juror was harmless, we affirm the judgment.

## I. BACKGROUND

The present prosecution had its origin in a 911 call made by Iverson from his apartment in the Town of Tonawanda, New York. In the course of ensuing interviews by officers of the Tonawanda Police Department ("TPD"), narcotics and drug distribution paraphernalia were discovered in Iverson's apartment; pursuant to

4

a subsequent search warrant, a firearm, ammunition, and other items were found and seized. Iverson moved to suppress all of the physical evidence, as well as certain statements he made to the officers. The following description of the events that occurred after the 911 call is taken from police reports and testimony given by several officers at the hearing on Iverson's suppression motion. Iverson did not testify, and his declaration in support of his motion to suppress was unsworn.

A. *Events Leading to Iverson's Arrest*

At 10:13 p.m. on October 22, 2014, Iverson called 911 to report that, on the landing below the door to his second-floor apartment, he saw an unknown black male wearing a hoodie and holding a gun by his side (the "Prowler"). TPD Officers Frank Bartolotta and Mark Muscoreil were dispatched to Iverson's building, arriving at 10:18 p.m. Muscoreil promptly secured the perimeter and interior of the building; Bartolotta spoke with Iverson in the hallway.

According to Iverson, earlier that night he had met a woman he knew only as "Candy" at a nearby liquor store, and Candy accompanied him back to his apartment. After nearly an hour, Candy went into the bathroom and Iverson could hear her talking on the telephone. When she emerged, she said she had to leave.

5

Iverson accompanied her to the door, and when she rushed past him Iverson saw the Prowler on the landing. Believing Candy had set him up to be robbed, Iverson immediately slammed the door and made his 911 call to the police.

TPD officers realized that Iverson's description of the Prowler was similar to that of a man being sought for robbing a pizza shop that evening some two miles from Iverson's building. After TPD Officers Jason Arlington and Ken Englert arrived at Iverson's building, Bartolotta and Muscoreil went to the liquor store where Iverson said he had met Candy, in order to view video surveillance footage in an effort to catch sight of Candy and/or the Prowler. They saw Iverson in the surveillance footage but did not see Candy or the Prowler.

In the meantime, TPD Officer Brent Costello who, with his K-9 dog Tank, had tried in vain earlier that evening to track the pizza shop robber, was dispatched to Iverson's building to attempt to track the Prowler. Costello and Tank, arriving at about 11 p.m., proceeded to explore the perimeter of Iverson's building and the surrounding area for nearly an hour seeking traces of the Prowler in places he might have passed or tried to hide--or seeking the Prowler's gun, on the chance that he had discarded it--but all without success. Costello and Arlington decided to speak with Iverson to see if he could give them any additional information as to the direction in

which the Prowler had gone.

Accordingly, Arlington and Englert, and Costello with Tank on a four-foot tracking leash attached to his belt, entered the building and went to the second floor, where they found the door to Iverson's apartment open. Arlington knocked on the open door, announced who they were, and called out to ask Iverson whether they could come in to speak to him. (*See* Suppression Hearing Transcript, July 20, 2015 ("July 20 S.Tr."), at 28, 12.) Iverson responded "come on in" (*id*. at 29 (internal quotation marks omitted)), or "come on in, Officers" (*id*. at 12 (internal quotation marks omitted)), or "come in, it's open" (Suppression Hearing Transcript, June 18, 2015 ("June 18 S.Tr."), at 20 (internal quotation marks omitted); *see id*. at 19-20). Iverson came into view in the foyer, and Arlington and Englert, followed by Costello with Tank tethered to his belt, entered the apartment. There was no furniture in the entryway, nothing to obstruct Iverson's view of Costello or Tank, and Iverson did not state any objection to having Tank in the apartment. (*See id*. at 21-22.)

Iverson said something like "you guys were just here" (*id*. at 21 (internal quotation marks omitted)); Arlington explained that they wanted to see if Iverson could supply any more information as to where the Prowler might have gone, and that the original officers were following up on something else. Iverson went into the

7

living room, and Arlington and Englert spoke with him from the living room or the foyer area (*see id*. at 100 ("they were speaking with him inside of the living room")); Costello and Tank remained in the entryway, from where they could see Iverson. At that point Costello did not go farther into the apartment because he was somewhat concerned that the Prowler, or perhaps an accomplice, might be lurking in the building. Costello testified that he was keeping Tank with him as he usually did, in part for the protection of the officers.

However, Tank is a multi-purpose police canine, in that he not only can perform patrol work by protecting officers and tracking suspects, but also can detect narcotics. When the officers entered Iverson's apartment it was not for the purpose of searching for drugs or contraband--they did not suspect Iverson of any crime--and Costello did not give Tank a command to search for drugs. But after Arlington had been talking with Iverson about the Prowler for some five minutes, Tank became agitated, began to bark, and pulled Costello toward the kitchen in a manner that alerted Costello that Tank had become aware of the odor of drugs.

Costello informed Arlington as to Tank's alert, and the officers confronted Iverson, stating that there appeared to be something in the apartment that should not be there. Iverson at first denied the presence of anything illegal, but after

the officers expressed skepticism he eventually told them he had an eighth of an ounce of marijuana. Asked where it was, Iverson led them to the kitchen. He opened a drawer, removed a bag of marijuana, and attempted to close the drawer. However, Costello, who had been watching closely to be sure that Iverson was not taking out a gun or a knife (*see* June 18 S.Tr. 30), saw a scale (*see id*. at 31-32); he also saw two more bags (*see id*. at 93), and asked what they were (*see id*. at 106-07). Iverson responded that they were his "personal stuff" and that "he didn't want to give it up." (*Id*. at 31.) Costello removed the other two bags, which contained marijuana, and told Iverson all of it was being confiscated.

After the officers returned Iverson to the living room, Costello told Iverson he believed there were still more narcotics in the apartment and asked whether Iverson had cocaine or crack. Iverson at first denied there was anything else; but when Costello said he would obtain a search warrant, Iverson admitted to having "a little powder" (*id*. at 32). He led the officers back to the kitchen; and from the drawer next to the one that had contained the marijuana, he removed a small bag of white powder, which subsequently field-tested positive for cocaine. Costello inquired about a larger bag of powder he spotted in this second drawer; Iverson said it was a substance he used for diluting the cocaine.

9

Costello then asked Iverson for permission to search the apartment. Iverson refused. Costello said he would get a search warrant if necessary; alternatively, deeming it possible that the small bag of powder contained an insufficient amount of cocaine to constitute a felony, Costello said that if Iverson would consent to a search, the officers, instead of arresting him, would give him "an appearance ticket"--similar to a traffic ticket--pursuant to which Iverson could come to court on the scheduled date and appear before a judge. Iverson declined to give any further consent.

After the substance in the small bag of powder tested positive for cocaine, Iverson was arrested.

On October 23, Costello obtained a search warrant for Iverson's apartment based on the events leading to Iverson's arrest. The search turned up, *inter alia*, additional bags of marijuana, quantities of crack, an assault rifle, and ammunition. Iverson was eventually indicted on the five narcotics and firearm counts described above.

Iverson moved to suppress the tangible evidence seized from his apartment, as well as statements he had made to the officers. His declaration--

10

unsworn--in support of that motion described the events of the night of October 22-23 only as follows:

> I had a reasonable expectation of privacy in my apartment, including the rooms within the apartment and the items therein.
>
> 3. I did not authorize law enforcement to search my apartment or the rooms and effects therein.
>
> 4. I did not voluntarily speak to law enforcement regarding the contents of my apartment on the dates in question.
>
> 5. At no time was I advised of my *Miranda* rights prior to or during law enforcement's questioning.

(Declaration of Elijah Iverson dated March 24, 2015, ¶¶ 2-5.)

B. *The Denial of Iverson's Suppression Motion*

Iverson's motion to suppress was referred, for report and recommendation, to a magistrate judge who held hearing sessions at which Officers Costello, Arlington, and Bartolotta testified. Finding the testimony of those officers more credible than the terse, unsworn declaration of Iverson, the magistrate judge recommended that the motion to suppress be denied.

The district judge reviewed the matter *de novo* and, in a Decision and Order dated February 25, 2016 ("February 2016 Opinion"), denied the motion to suppress in its entirety. With respect to Iverson's principal argument on this appeal, *i.e.*, that he did not consent to have Costello's K-9 partner Tank in the apartment, the district court found the events to have occurred, in all important respects, as described in Part I.A. above. It found that after Costello and Tank had failed to find a scent of the Prowler, they, along with Arlington and Englert, went to Iverson's apartment to make one more effort to see if Iverson could provide any additional information to suggest where the Prowler had gone. Arriving at Iverson's door,

> Arlington called out for Iverson and knocked. Iverson responded, "come in, it's open." The officers did not announce that they had a dog with them. According to Officer Costello, Iverson then came to the door . . . and everyone walked into the apartment. Officers Arlington and Englert entered first, followed by Officer Costello with Tank tethered to his gun belt on a four-foot leash. Iverson had a clear line of sight to Tank and did not object to the dog's entry.

> Officer Arlington asked Iverson about another possible spot the suspect had run from or to. Along with Officer Englert, Iverson and Officer Arlington then moved to the living room while Officer Costello and Tank remained in the hallway entrance area of the apartment. From his location in the living room, Iverson still had a clear sight line to Tank.

February 2016 Opinion at 5 (internal quotation marks and citations omitted). The

12

court noted Iverson's counsel's suggestion that Iverson might not have known that Tank was a drug-detecting dog and might not have allowed Tank to enter if he had; but the court pointed out that "Iverson's largely conclusory and unsworn declaration does not even mention Tank, let alone state whether the dog had permission to enter the apartment." *Id*. at 15.

After reviewing Supreme Court cases including *Illinois v. Caballes*, 543 U.S. 405 (2005), and *Florida v. Jardines*, 569 U.S. 1 (2013), the district court concluded that there was no violation of Iverson's Fourth Amendment rights. The court found it "undisputed that Iverson called 911 to report a person who may have been an armed robber, and the officers' behavior objectively revealed a purpose to follow up on that request for assistance." February 2016 Opinion at 12. It noted that Bartolotta, after "viewing the surveillance video from the liquor store," had begun typing a report in which he "indicate[d] that [he] had a hunch that Iverson had concocted a 'vague' and 'untrue' story about meeting a woman named Candy at the liquor store to hide the fact that Iverson was 'selling drugs out of the apartment.'" *Id*. at 4 (quoting Town of Tonawanda Police Report dated October 22, 2014, at 1). However, the court found that "Bartolotta did not communicate this hunch to Officer Costello," February 2016 Opinion at 4, and that "there [wa]s no . . . evidence" that any of "the officers who

13

actually entered the apartment with Tank" had such a suspicion, *id*. at 12 n.3. "Tank was with Officer Costello to assist in the search for the suspicious person Iverson [had] reported," *id*. at 12, not to search for drugs. "Costello never gave [a] command" for a drug search, "and Tank remained tethered at his side while they were in Iverson's apartment." *Id*. at 6. And "[b]oth [Costello] and Officer Arlington" testified that they did not have "any ulterior motives in going to Iverson's apartment, such as searching for contraband." *Id*. at 4. The court pointed out that "Iverson offered nothing that refutes the government's evidence." *Id*. at 15.

The district court found, in summary, that the officers were present in Iverson's apartment "only as a result of the 911 call that Iverson himself made," that it was "undisputed that the human officers had at least an implicit license to enter the apartment," that "the officers had an implicit license to enter Iverson's apartment with Tank," and that "Iverson observed Tank enter his apartment and remain[,] without objection." February 2016 Opinion at 11 (internal quotation marks omitted). The court concluded that there was no unreasonable search in violation of the Fourth Amendment.

14

C. *The Trial*

During jury selection at Iverson's trial, an issue arose as to the government's use of its peremptory challenges, and a *Batson* objection by Iverson was upheld, resulting in the seating of two black jurors against whom the government had used peremptories. One of those jurors was dismissed by the court *sua sponte* during the trial, giving rise to Iverson's second principal contention on this appeal (*see* Part II.C. below). The reconfigured jury convicted Iverson on all of the counts against him.

## II. DISCUSSION

On appeal, Iverson contends (1) that the district court erred in denying his motion to suppress, arguing principally that it erroneously found that he had implicitly consented to the presence in his home of a dog capable of detecting narcotics, and (2) that the court's dismissal of a juror seated in response to a successful *Batson* objection violated Iverson's Fifth and Sixth Amendment rights to equal protection and trial by a jury drawn from a cross-section of the community. For the reasons that follow, we find no basis for reversal.

A. *The Conduct of the Officers and the Performance of Tank*

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ."  U.S. Const. amend. IV.  It is useful in the present case to distinguish among the various interests thereby protected.

"[T]he chief evil against which the wording of the Fourth Amendment is directed" is "the physical entry of the home." *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (internal quotation marks omitted); *see, e.g.*, *Jardines*, 569 U.S. at 6 ("At the Amendment's very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." (internal quotation marks omitted)).  The Amendment also expressly protects against unreasonable searches and seizures.  "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed.  A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984) (footnote omitted).

Because "the ultimate touchstone of the Fourth Amendment is 'reasonableness,'" its "warrant requirement is subject to certain reasonable

16

exceptions."  *Kentucky v. King*, 563 U.S. 452, 459 (2011) (internal quotation marks omitted).  If a defendant has shown that he had a reasonable expectation of privacy in the place or object in question, the government has the burden of showing that the entry, search, or seizure was lawful because it fell within one of the exceptions to the warrant requirement. *See, e.g.*, *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). One such exception is that a warrantless entry and search are permissible if the authorities have obtained the voluntary consent of a person authorized to grant such consent. *See generally id.*; *Illinois v. Rodriguez*, 497 U.S. 177, 183 (1990).  The "[c]onsent must be a product of that individual's free and unconstrained choice, . . . rather than a mere acquiescence in a show of authority." *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993), *cert. denied*, 511 U.S. 1025 (1994); *see, e.g.*, *United States v. Sanchez*, 635 F.2d 47, 58-59 (2d Cir. 1980).  Determination of whether such an individual has so consented requires a fact-based inquiry that considers the "totality of all the circumstances." *Schneckloth*, 412 U.S. at 227.

Consent may be express or implied.  *See, e.g.*, *Jardines*, 569 U.S. at 6, 9; *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995); *United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir.), *cert. denied*, 454 U.S. 830 (1981); *United States v. Grant*, 375 F. App'x 79, 80 (2d Cir. 2010).  In *Jardines*, the Supreme Court noted that a consent or

17

"license" to enter a home's curtilage "may be implied from the habits of the country," such as by providing a "knocker on the front door," signifying "an invitation or license to attempt an entry" and "typically permit[ting] the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." 569 U.S. at 8 (internal quotation marks omitted). However, as the *Jardines* Court stated, "[t]he scope of a license--express or implied--is limited not only to a particular area but also to a specific purpose," *id*. at 9, and the Court held that a license to knock on the door to request entry did not constitute or imply consent for the conduct that was at issue in that case, which was law enforcement officers' bringing a drug-sniffing dog to the defendant's porch for the sole purpose of having it attempt to detect the aroma of narcotics within the house, *see id*. at 3-4, 9. As the officers' "behavior objectively reveal[ed] a purpose to conduct a search," the Court concluded that their conduct constituted a search, within the meaning of the Fourth Amendment, "which is not what anyone would think he had license to do." *Id*. at 10.

On an appeal challenging a district court's ruling on a motion to suppress evidence, we review its legal conclusions *de novo* and its findings of fact for clear error. *See, e.g., United States v. Ganias*, 824 F.3d 199, 208 (2d Cir.) (en banc), *cert. denied*,

18

137 S. Ct. 569 (2016).

> In reviewing the denial of such a motion, we "view[] the evidence in the light most favorable to the government," *United States v. Ivezaj*, 568 F.3d 88, 96 (2d Cir. 2009), *cert. denied*, 559 U.S. 998, 130 S.Ct. 1749, 176 L.Ed.2d 223 (2010), and we give "special deference to findings that are based on determinations of witness credibility," *United States v. Lucky*, 569 F.3d 101, 106 (2d Cir. 2009), *cert. denied*, 559 U.S. 1031, 130 S.Ct. 1878, 176 L.Ed.2d 403 (2010). Whether the Fourth Amendment was violated, given the nonerroneous findings of historical fact, is a question of law, which we review *de novo*. *See id*. at 105-06.

*United States v. Delva*, 858 F.3d 135, 148 (2d Cir. 2017), *cert. denied*, 138 U.S. 1309 (2018).

"Because the trial court is in a unique position to evaluate witnesses' credibility, we will not reverse its determination on" such issues as the voluntariness of consent "unless the decision is clearly erroneous." *United States v. Davis*, 967 F.2d 84, 86 (2d Cir.) (internal quotation marks omitted), *cert. denied*, 506 U.S. 928 (1992); *see also Ornelas v. United States*, 517 U.S. 690, 699 (1996) ("a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers").

Here, in challenging the district court's factual findings, Iverson asserts that it is "clear that Mr. Iverson did not give his consent for Tank to enter the

19

apartment" (Iverson brief on appeal at 24); that "[c]learly, whatever consent Mr. Iverson gave Officer Arlington to enter his apartment did not extend to Tank" (*id.* at 25); and that "[t]here was no testimony to establish that Mr. Iverson saw Tank, only Officer Costello's testimony that he thought Mr. Iverson had an unobstructed line of vision to where he and the dog were standing . . . . not that [Iverson] actually saw Tank" (*id.* at 26). He also states that he had no way of knowing that Tank was capable of detecting drugs because "[t]he TPD officers admitted during the suppression hearing that they did not specifically ask Mr. Iverson for permission to bring a *drug-detection* canine into his apartment" (*id.* at 25-26 (emphasis added)).

These arguments fall far short of showing error, much less any clear error, in the district court's findings. First, although Iverson points out that Costello did not testify that Iverson "actually saw" Tank, the only person who would have been competent to testify to what Iverson "actually" saw was Iverson himself, and Iverson presented the court with no assertions under oath. He attended the hearing but chose not to testify (*see*, *e.g.*, July 20 S.Tr. 3, 62); and his declaration in support of his suppression motion was not only unsworn, it made no mention whatever of Tank. Thus, there was no evidence that Iverson did not see Tank or that Tank was not always in his line of sight. Given Costello's testimony, which the court found

20

credible, the court permissibly inferred that Iverson saw Tank and that his invitation to enter the apartment implicitly encompassed Tank.

Second, Iverson's point that the officers did not ask for permission to bring "a drug-detection canine" into his apartment has no bearing on the issue of consent in the context of this case. Arlington and Costello testified that they went to the apartment solely to ask to speak with Iverson about the armed man he had reported seeing in his building. While Iverson states that "the evidence in the record established otherwise," because "[p]rior to Officer Costello's arrival, *the initial responders* became suspicious that Mr. Iverson was dealing drugs out of his apartment" (Iverson brief on appeal at 27 (emphasis added)), the record in fact provides no support for an inference that Arlington, Englert, or Costello had any inkling of such a suspicion. First, the initial responders, Bartolotta and Muscoreil, themselves had no such suspicion until after they viewed surveillance video at the liquor store and saw no Candy to support Iverson's story; Costello arrived at Iverson's building after Bartolotta and Muscoreil had left for the liquor store and prior to their return. And Bartolotta (Muscoreil did not testify) testified that after their return to Iverson's building, he spoke only with his lieutenant and did not speak with any of the other officers. There was no evidence that any suspicions Bartolotta and

21

Muscoreil may have developed at the liquor store were relayed to Arlington, Englert, or Costello before they went to Iverson's apartment. The district court thus permissibly found on the basis of the officers' testimony--and without any conflicting evidence--that Arlington, Englert, and Costello went to Iverson's apartment solely for the purpose of seeking information about the Prowler, and not with any notion that Iverson had drugs. Tank had just spent the better part of an hour trying to sniff out the Iverson-reported man with a gun; the officers had no reason to mention that Tank also had the ability to recognize and react to the odor of narcotics.

Iverson also argues, citing *United States v. Shaibu*, 920 F.2d 1423, 1427-28 (9th Cir. 1990) ("*Shaibu*"), that "[b]y ruling that Mr. Iverson's failure to object to Tank's entry [w]as an implicit invitation for the dog to come inside, the lower court improperly shifted the burden on the issue of consent to Mr. Iverson" (Iverson brief on appeal at 26). Iverson's reliance on *Shaibu*--which ruled that "in the absence of a specific request by police for permission to enter a home, a defendant's failure to object to such entry is not sufficient to establish free and voluntary consent," *Shaibu*, 920 F.2d at 1428--is misplaced. As a general matter, this Court has in the past declined to follow *Shaibu*, stating that "[o]ur precedent is to the contrary," as appropriate inferences may be drawn from actions and gestures as well as words.

22

*United States v. Garcia*, 56 F.3d at 424. And this case in particular is unlike *Shaibu* in that (a) the officers here did ask for permission to enter Iverson's apartment (*see* July 20 S.Tr. 12 (Arlington testifying that, after knocking, "I asked if we could come in and speak to him")); and (b) Iverson did not merely fail to object to the entry of those who came to his door, he said "come on in" (*e.g.*, *id*. (internal quotation marks omitted)).

Finally, Iverson also argues, apparently, as a matter of law, that the officers' merely bringing Tank into his apartment constituted a search. (*See* Iverson brief on appeal at 27 ("Tank does not need a command to alert to the presence of narcotics. Thus, by bringing him into the apartment, Tank, by training, conducted an illegal search.").) This contention is likewise meritless. Even as to a dog that has been commanded to sniff a closed item of luggage in a location where the owner has no reasonable expectation of privacy, the Supreme Court has reasoned that the "canine sniff" does "*not constitute a 'search' within the meaning of the Fourth Amendment*." *United States v. Place*, 462 U.S. 696, 707 (1983) (emphasis added); *see generally Caballes*, 543 U.S. at 408 ("Official conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment." (quoting *Jacobsen*, 466 U.S. at 123)). Thus, "[a]s long as the observing person or the sniffing canine are legally present at their vantage [points] when their respective senses are aroused by obviously

23

incriminating evidence, a search within the meaning of the Fourth Amendment has not occurred." *United States v. Reed*, 141 F.3d 644, 649 (6th Cir. 1998); *see, e.g., United States v. Beene*, 818 F.3d 157, 162 (5th Cir.) ("[a] dog sniff" that does not involve an unreasonably prolonged detention and does not involve an unreasonable intrusion into a constitutionally protected area "is typically *not a search*" (emphasis added)), *cert. denied*, 137 S. Ct. 113 (2016); *see also United States v. Rodriguez-Morales*, 929 F.2d 780, 788 (1st Cir. 1991) ("the canine sniff of the exterior of a vehicle which is legitimately within the custody of the police *is not a search within the meaning of the [F]ourth [A]mendment*; . . . subjecting the exterior of such a motor vehicle to the olfactory genius of a drug detection dog does not infringe upon the vehicle owner's [F]ourth [A]mendment rights" (emphasis added)), *cert. denied*, 502 U.S. 1030 (1992); *United States v. Sharp*, 689 F.3d 616, 619 (6th Cir.) (noting that the unanimous view, of the circuits considering the issue, is that where a drug-detecting canine, without any command or encouragement by law enforcement, "instinctive[ly] jump[s]" into a private vehicle on its own initiative, its action does not violate the Fourth Amendment (citing decisions of the Third, Eighth, and Tenth Circuits)), *cert. denied*, 568 U.S. 1056 (2012).

Here, the undisputed evidence showed that Iverson expressly consented to the officers' entering his apartment, and the district court did not err in finding that

24

that consent implicitly extended to Tank. Although that license to be in the apartment was doubtless limited as to both purpose and area, the officers' behavior objectively revealed that they had not entered with any intent to conduct a search. The undisputed evidence was that, until Tank alerted to the presence of drugs and Iverson was confronted with that fact, Arlington and Englert had entered no farther into the apartment than the living room or the doorway to it, and Costello and Tank had not gone past the entry hall. Tank was not given any command with respect to narcotics; Arlington had been questioning Iverson about the Prowler for some five minutes when Tank simply caught and reacted to the aroma of drugs. Given that the officers and Tank were lawfully where they were, Iverson had no legitimate or reasonable expectation of privacy in airborne particles bearing odors. Accordingly, the district court correctly held that there was no unreasonable search in violation of the Fourth Amendment.

B. *Iverson's Other Requests for Suppression*

We also reject Iverson's arguments that the district court erred in failing to suppress statements he made while in his apartment as (1) "fruit of the poisonous tree" (Iverson brief on appeal at 28 (internal quotation marks omitted)), (2) violative

of his Fifth Amendment rights because he had not yet been given *Miranda* warnings (*see id*. at 29-32), or (3) simply involuntary (*see id*. at 32-33). Iverson's "fruit of the poisonous tree" argument is moot, as its viability was contingent on his contention that his permission for the officers to enter his apartment did not encompass Tank, a contention we have rejected. We find no merit in Iverson's other arguments, substantially for the reasons stated by the district court in its February 2016 Opinion.

C. *"Prospective Juror 16" Becomes "Juror No. 8" but Is Dismissed*

The 60-person panel of prospective jurors for Iverson's trial in July 2016 included three black persons, one of whom was excused for cause. The other two black prospective jurors--"Prospective Juror 6" and "Prospective Juror 16"--were eventually empaneled as jurors; but Prospective Juror 16, empaneled as Juror No. 8, was dismissed from the jury by the district court *sua sponte* during trial. The voir dire and subsequent proceedings with regard to the dismissed juror included the following.

### 1. *The Voir Dire and Iverson's Successful* Batson *Objection*

On voir dire, Prospective Juror 16, then age 51, stated that he was from the Island of Jamaica and "never finished school.  [He] stopped going to school at sixth grade" in order to work to help his mother and to help his siblings get their educations.  (Jury Selection Transcript ("J.Tr.") 156; *see id*. at 157.)  The court, apparently making reference to a summary sheet or card containing questions as to which the prospective jurors were to describe their background information, asked Prospective Juror 16 to continue:

> THE COURT:  . . . .  It's a great story, sir, keep telling us.  Take a look at the--are you having trouble reading any of the--
>
> PROSPECTIVE JUROR 16:  Yeah.  Like I said, I didn't finish school, you know.
>
> THE COURT:  Okay.  So why don't I ask you some of the questions, and you can answer them as best you can.  And you can follow along with me on the card.
>
> Do you read English?
>
> PROSPECTIVE JUROR 16:  I understand English.  I read a little bit, I'm not fully--really a good reader.
>
> THE COURT:  Okay.  So let me ask the questions, and we can go through them.

(*Id*. at 157-58.)  After determining that Prospective Juror 16 had worked at various

manual jobs in Jamaica, had been a construction worker in the United States, and was currently on disability status, the court asked,

THE COURT: . . . . Do you--do you get any newspapers or magazines?

PROSPECTIVE JUROR 16: Yeah, I look at them. I look at magazines.

THE COURT: What kind of magazines do you like to get?

PROSPECTIVE JUROR 16: Time.

THE COURT: Okay. And do you try to read that from time to time?

PROSPECTIVE JUROR 16: Yeah, I try to sometimes.

THE COURT: And can you get--can you make out what the stories are about?

PROSPECTIVE JUROR 16: At times, yeah.

(*Id*. at 161-62.)

The government used two of its peremptory challenges against Prospective Juror 6 and Prospective Juror 16. Iverson made a *Batson* objection, arguing that the challenges were based on race. In response, the government stated that it excused Prospective Juror 6 because he had "spent most of [the first morning

of jury selection] sleeping while the Court was giving questions and instructions, literally sleeping" (*id*. at 230), and that he had returned late from lunch, thereby demonstrating that "[h]e can't follow the Court's instructions" (*id*. at 231). As to Prospective Juror 16, the government stated that

> [Prospective Juror 16] has told the Court he wasn't able to read the [jury] questionnaire, he doesn't understand how to read basic English. You know, he tries to read magazines when he can, but he doesn't understand English. He has a very limited education, never educated after the sixth grade.
>
> And I don't believe that a person with that limited education is going to be able to comprehend the sophisticated federal laws that we're talking about here.

(*Id*. at 231.)

The district court upheld Iverson's *Batson* objection with respect to both jurors. As to Prospective Juror 6, the court stated that any sleeping during trial would be "easily corrected" and was something for which the court would be alert. (*Id*. at 236.) With respect to Prospective Juror 16--empaneled as, and hereafter referred to as, Juror No. 8--the district court stated that although uneducated, "[h]e seemed to be bright, . . . and he impressed me as being able to grasp the facts" (*id*. at 237).

## 2. *Events During Trial*

The presentation of evidence at trial began on July 13 and ended on July 15.  On July 14, the government moved for reconsideration of the court's *Batson* decision--a motion that was not decided until October.  In the meantime, on July 15 after both sides had rested and before summations were begun, Juror No. 8 was dismissed and replaced by an alternate.  The circumstances were as follows.

The trial judge informed the parties that he had been alerted by the court's jury administrator that Juror No. 8, "the person who was 16 in our panel . . . may not have filled out his own jury questionnaire, which raises a question of whether he can read and write well enough to fill out the juror questionnaire, which I think is the only requirement with respect to being able to read and write."  (Trial Transcript ("T.Tr.") 396.)  The court stated that the jury administrator questioned whether Juror No. 8 "signed it or whether his wife signed it for him, whether he read it."  (*Id*. at 397.)  The court solicited suggestions as to how it should proceed.  (*See id*.)

After an Assistant United States Attorney ("AUSA") posed the question of whether it was legally permissible for Juror No. 8 to remain on the jury if he was unqualified as a matter of law, the court said,

Why don't we talk to him, then? . . . [S]hould we bring him in? I think by himself, right? And perhaps talk to him up here . . . at the bench?

. . . .

[AUSA] VIOLANTI: Judge, I know also in the past, . . . courts have taken jurors in chambers to avoid embarrassment and talk[ed] to them, and then parties rely on that--obviously, the Court's not going to be deceptive--and then come back and report that way. However the Court wants to do it is fine with the government.

. . . .

THE COURT: . . . .

Do you have a problem with it?

[DEFENSE COUNSEL] JORDAN: So, you'll be addressing him?

THE COURT: Yeah, I'll just talk to him one on one, me and him.

[DEFENSE COUNSEL] JORDAN: Sure.

(*Id*. at 398-99.)

The court's ensuing *in camera* questioning of Juror No. 8 was not recorded. When the interview ended, the judge returned to the courtroom and held a sidebar, with Iverson included, and reported to the parties what had transpired

31

*in camera* and reported that Juror No. 8 had been dismissed:

*I made an inquiry of the juror, and it turns out he cannot read and write.*

When I asked him, his answer was:  Not so well.

And I said:  Well, did you fill out this [jury questionnaire]?

*He said*:  No, *his wife filled out the form.*

*I said:  Well, did she do it just because it was convenient for her to do it?*

*He said:  No, I can't do it.*

And from my discussion, *it appeared to me that he really can't read or write*, that he--*it's not simply not reading and writing so well, it's that he doesn't want to admit that he's illiterate.*

So I think under the statute [governing juror qualifications], he is disqualified as a juror, and so the jury will consist[] of the 11 who were jurors and the first alternate.

*I've excused him. . . .*  I didn't want to, but I think that the statute's pretty clear that someone needs to be able to read and write well enough to be a juror for them to participate in this, and I don't think--he didn't fill out the form itself, the signature on the form was not his, . . . and so I don't think we can continue with him.

And I apologize for this.  Maybe we should have done a little bit more searching and inquiry during the jury selection.  I don't think anyone anticipated this sort of a problem coming up.

And just so I can explain, the jury administrator mistook his wife for a juror and asked--or, was talking to her. And she said no, no, no, I'm not a juror, I'm here because my husband needs me here because he can't read or write. . . .

. . . .

[DEFENSE COUNSEL] JORDAN: I would like my objection on the record, Judge. We knew during the voir dire that this individual could not read.

THE COURT: We really didn't. During voir dire, we knew he had trouble reading, but he said he did look at the newspaper, which I generously interpreted that he could read a little bit, at least well enough, I assumed, to fill out the jury form. That turned out not to be the case, and so that's why I've made [the dismissal] decision.

(*Id*. at 400-02 (emphases added).)

In a Decision and Order dated October 21, 2016 ("October 2016 Order"), the court reiterated that the information it "learned later during the trial" revealed that "Juror [No. 8] could not read English at all. When questioned privately during the trial, he admitted exactly that: he admitted that his wife had to complete the jury form for him because he could not do it himself. And for that reason, he was disqualified and replaced with an alternate juror." October 2016 Order at 7-8. The district court vacated its July *Batson* finding of an improperly used peremptory

33

challenge with respect to Juror No. 8, while noting that because that juror "was eventually excused, the point is largely moot."  (*Id*. at 8.)

3. *The Propriety of the Dismissal of Juror No. 8*

On appeal, Iverson contends that the district court erred procedurally in dismissing Juror No. 8 without Iverson's being present and without giving him an opportunity to argue after the court interviewed the juror.  Iverson contends that the court erred substantively by undoing its earlier *Batson* ruling and thereby drastically changing the composition of the jury, in violation of both his Sixth Amendment right to be tried by a jury reflecting a cross-section of the community and his Fifth Amendment equal protection right not to have persons excluded from the jury on the basis of race.  We are unpersuaded by Iverson's constitutional contentions, and while we agree that there was procedural error, we conclude that any such errors were harmless.

There is a fundamental "public[] interest in fair trials designed to end in just judgments," *United States v. Jorn*, 400 U.S. 470, 480 (1971) (plurality opinion) (internal quotation marks omitted), giving both society and the parties an interest in restricting jury service to persons who are competent to serve.  A prospective juror

34

who is unqualified is properly dismissed for cause. *See, e.g.*, *United States v. Pineda*, 743 F.3d 213, 217 (7th Cir. 2014) (a juror who "is unable to read, write, speak, and understand English may be appropriately stricken for cause"). A defendant's constitutional rights to be tried by a jury reflecting a cross-section of the community and by a jury from which persons have not been excluded by reason of race do not override the interest in restricting jury service to persons who are competent to serve.

The Jury Selection and Service Act of 1968 ("Act"), codified primarily at 28 U.S.C. §§ 1861-69, provides, with exceptions not relevant here, that a person is qualified to serve on a jury "unless," *inter alia*, he or she "is unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form," *id*. § 1865(b)(2). The Act requires the court clerk or jury commission (collectively "Jury Clerk") to mail to every person whose name has been randomly drawn from the master wheel a juror qualification form, with instructions to fill out, sign, and promptly return the form to the Jury Clerk; it also provides that "[i]f the person is unable to fill out the form, another shall do it for him, and shall indicate that he has done so and the reason therefor." *Id*. § 1864(a); *see also id*. ("Any person who fails to return a completed juror qualification form as

instructed may be summoned by the [Jury Clerk] forthwith to appear before the [Jury Clerk] to fill out a juror qualification form.").

Although Iverson argues that nothing in these provisions "provide[s] any objective basis for a trial judge to determine whether a prospective juror had 'satisfactorily' filled out a juror qualification form" (Iverson brief on appeal at 38), that surely is not so in the context of this case. Section 1864, read as a whole, clearly means that someone is required to fill out the questionnaire; and if the addressee is unable to do it because of illiteracy, he is, under the terms of § 1865(b)(2), unqualified to serve.

At a jury trial, the court may "impanel up to 6 alternate jurors to replace any jurors who are unable to perform or who are disqualified from performing their duties." Fed. R. Crim. P. 24(c)(1). "The issue of what, if any, inquiry must be made before deciding whether a juror should be excused . . . is committed to the judge's discretion. This court need only satisfy itself that the district court had sufficient information to make an informed decision." *United States v. Mulder*, 273 F.3d 91, 108 (2d Cir. 2001) (internal citation omitted), *cert. denied*, 535 U.S. 949 (2002).

An accused has a right under the Sixth Amendment to be present at his own trial "at any stage of the criminal proceeding that is critical to its outcome if [the

defendant's] presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). This right is codified in Rule 43 of the Federal Rules of Criminal Procedure, *see United States v. Rosario*, 111 F.3d 293, 298 (2d Cir.), *cert. denied*, 522 U.S. 969 (1997), which provides that "the defendant must be present at," *inter alia*, "every trial stage," Fed. R. Crim. P. 43(a)(2). This normally means that there should be no "private communications between the judge and jur[ors] . . . . regardless of whether the communication concerns issues that are personal in nature and unrelated to the trial, or issues that bear on the substance of the proceedings." *United States v. Evans*, 352 F.3d 65, 68 (2d Cir. 2003) ("*Evans*") (internal quotation marks omitted). In the present case, however, as set out in Part II.C.2. above, and is undisputed, the district judge "spoke ex parte with [Juror No. 8]" "[w]ith the permission of the parties" (Iverson brief on appeal at 33).

Nonetheless, we see no indication in the record that Iverson agreed to forgo his right to be present for the court's oral dismissal of Juror No. 8 or that the parties agreed that the court should render a decision without the parties' both (a) being apprised as to what information was revealed in the *in camera* interview and (b) having an opportunity to present their positions as to the propriety of dismissal. The court's statement "I'll just talk to [Juror No. 8] one on one, me and him" (T.Tr. 399), did

37

not suggest that the court--without returning to the courtroom, reporting to the parties, and hearing argument--would immediately proceed to dismiss the juror.

Thus, the court's dismissal of Juror No. 8 before returning to the courtroom to report the results of its interview and allow argument by the parties was a procedural error. Further, especially given that the interview was *in camera*--and given the frequently hesitant tenor of the answers given by Juror No. 8 during voir dire--it would have been much the better practice to have a court reporter record the interview.

Nonetheless, we see in these procedural missteps no basis for reversal. "Rule 43 violations are analyzed under the traditional harmless error rule provided by Federal Rule of Criminal Procedure 52(a)," *Evans*, 352 F.3d at 68, and "[w]e review a district court's dismissal of a juror for an abuse of discretion," *id*. "A dismissal should not be overturned without a showing of bias or prejudice to the defendant." *Id*.; *see also United States v. Walker*, 243 F. App'x 621, 624 (2d Cir. 2007) (applying same standard to the dismissal of a juror who had been empaneled as a result of a successful *Batson* objection).

Although we have never ruled whether the proper harmless error standard in this context is harmless beyond a reasonable doubt, *see Chapman v.*

38

*California*, 386 U.S. 18, 26 (1967), or by a fair assurance that the verdict was not affected, *see Kotteakos v. United States*, 328 U.S. 750, 764-65 (1946), *see, e.g., Evans*, 352 F.3d at 69, we need not decide the question today. We are persuaded that the district court's error was harmless even under the more stringent "beyond a reasonable doubt" standard.

We see neither a substantive error nor any prejudice resulting from the procedural error. The record before us is adequate to show that the district court had sufficient information to make an informed decision about Juror No. 8's statutory eligibility to serve as a juror. Given his answers to the court's questions in the *in camera* interview, set out in Part II.C.2. above, the court's finding that Juror No. 8 could not read or write is not clearly erroneous. The court's conclusion that as a consequence he was not qualified to be a juror was thus compelled by the Act, and the decision that he should be dismissed from the jury was not error.

We do not necessarily agree with the view expressed by the district court in its October 2016 Order that Juror No. 8 should thus have been excused at voir dire. While the tone and content of the answers given during the voir dire should perhaps have prompted the court to inquire further, the actual record at that stage was not clear as to the extent of Juror No. 8's ability to read or write. But the additional

39

answers received by the court during the *in camera* interview justified the court's finding that Juror No. 8 could not read or write and its conclusion that he was therefore not qualified to be a juror.

The fact that Juror No. 8 had been seated on the jury following the successful *Batson* objection to the government's use of its peremptory challenges has no bearing on the propriety of his dismissal. Given the court's permissible finding that Juror No. 8 was unable to read or write, the conclusion that he was, under the Act, not qualified to serve as a juror was correct. Thus, he was excusable for cause.

Iverson suggests he was prejudiced by the dismissal of Juror No. 8 because it effected "a drastic shift in the jury's composition" because it "reduc[ed] the number of black jurors from two to one." (Iverson brief on appeal at 44.) Although the dismissal of Juror No. 8 did leave the jury with just one black member, we cannot conclude that this constituted any cognizable prejudice. As indicated above, the panel of prospective jurors, other than Juror No. 8, included only two black persons, one of whom had already been excused for cause and the other of whom was eventually empaneled. Thus, had Juror No. 8 been fully vetted during voir dire, leading to his timely disqualification, the jury would have included just one black juror, as it eventually did.

# CONCLUSION

We have considered all of Iverson's arguments on this appeal and have found in them no basis for reversal.  The judgment of conviction is affirmed.